JOHN TREAT, JR., *&* al. *versus* DANIEL LORD *&* al.

The State, by virtue of its sovereignty or right of eminent domain, may abridge, control or destroy a public easement in a stream within its limits; but until it does so by positive legislation all persons may lawfully enjoy such easement in common with the State.

It is otherwise in regard to public lands. The person who enters upon them without license is a trespasser; he has no rights in them in common with the State; he may disseize the State, and after he has acquired title by lapse of time, a release or grant of them by the State to other persons will not disturb his title; but such rights as are a part of the State sovereignty, conferred for the public good, cannot be lost by disseizin.

A conveyance by the State of all its right, title and interest in and to the lands over which a navigable stream flows, does not authorize the grantee, or those claiming under him, to use exclusively or to destroy the public easement in said stream.

The statutes in relation to the right of erecting mills and mill-dams, and of flowing lands, are not to be so construed as to excuse or justify the erection of a dam in such a manner as to overflow a public highway already appropriated and in actual use, and thereby render it impassable, nor to interrupt or destroy the public easement or right of way in a stream upon which it is constructed.

If a stream is inherently and in its nature capable of being used for the purposes of commerce, for the floating of vessels, boats, rafts or logs, a public easement exists therein. In such case the owner of the soil can use it in all modes not inconsistent with the public right.

The right of the public exists in such a stream notwithstanding it may be necessary for persons floating logs or boats thereon sometimes to go upon its banks.

No accidental or intentional obstruction in a stream, not there in its natural state, will legally take from it its inherent and natural capability as a public highway.

Whether a stream is capable of being used as a passage-way for the purposes of commerce is a question of fact for the jury.

Streams which are so small and shoal that no logs can be driven in them without being propelled by persons traveling on their banks are not navigable in any sense to give the public a right of way in them.

It is not the right of counsel to have a requested instruction to the jury, in itself proper, given in the precise words of the request. It is sufficient if it be substantially given.

The Court is under no obligation to give instructions, however correct in law, which have no connection with the evidence in the case.

On EXCEPTIONS from *Nisi Prius*, HATHAWAY, J., presiding.

This was an action of trespass *quare clausum*. The general issue, with a brief statement, was pleaded.

Plaintiffs showed that, at the time of the alleged trespass, they were in possession of the land over which Cold stream flows, and the land on both sides of it, from the point where it issues from Cold stream pond to the dead water, about half a mile below; that they had on said stream four dams, on three of which they had valuable mills; that on June 5th, 1854, and from that time to the date of the writ, the defendants and their servants, against the consent of plaintiffs, drove a large quantity of mill-logs from said pond down said stream, removed plaintiffs' mill-logs in their mill-pond to their damage, cut away or broke through a dam and flume of plaintiffs', and sluiced defendants' logs through one of plaintiffs' mills, &c.

Plaintiffs further showed, that the Legislature of Massachusetts, on Feb. 7th, 1820, passed a resolve empowering and directing the commissioners of the Land Office of said State, to convey to Joseph Treat of Bangor, five thousand acres of land therein described, being the same now marked "Treat's Grant," in Greenleaf's map of Maine, including the *locus in quo*, on condition, among other things, that said Treat should give his bond, with sufficient sureties, conditioned that within two years from the passing of the resolve, he would faithfully erect and put in operation a good and sufficient saw-mill and grist-mill on Cold stream, so called; that said Treat complied with said condition; and that said commissioners, on Feb. 14th, 1820, conveyed to him said five thousand acres of land, agreeably to the terms of the resolve; that said mill is still standing and in operation; that at the same time he erected a

dam across said stream, to raise a head of water for his mills, which dam is still standing, being one of those through which defendants passed their logs; and put in evidence tending to show, that he, and those claiming under him, had remained in possession of said stream ever since, claiming and enjoying exclusive right there, excluding the passage of any logs, boats, rafts, &c., through that part of said stream, except by their special license. And they further showed, that said Treat's title to said stream, and the lands on both sides of it, for some half mile from the pond, through mesne conveyances, had become vested in them prior to the time of the alleged trespass; and also that, at the date of said resolve, and said deed to Joseph Treat, all the lands bordering on said Cold stream pond, and all the lands now constituting the towns of Enfield, Lincoln, Lowell and Burlington, were unsettled, and the property of the State of Massachusetts. There are no waters connected with said pond, except those lying in some one of said towns.

Defendants showed that prior to entering plaintiffs' close, they demanded of them seasonably to open a passage for their logs, which plaintiffs refused to do, and forbade defendants driving their logs through; that defendants thereupon drove through. And they introduced evidence tending to show that they did as little damage to the plaintiffs as they could under the circumstances. They showed that the logs which they drove through, were cut on the shores of Cold stream pond, and that this stream is the only outlet of the pond.

They also introduced evidence tending to show that said Cold stream, from its quantity of water, the nature of its channel, &c., was capable of being driven in its natural state, when cleared of brush and fallen trees.

Plaintiffs introduced evidence tending to show that said stream was narrow and shoal, varying from ten feet to two rods in width, and in its narrowest parts carrying a depth of about one foot of water in the time of the spring freshet; and in its wider parts, divided and running round among the

rocks and standing trees; that there was a fall of about fifty-seven feet between the pond and the still water; that at the time said Treat commenced his works there, the outlet of the pond was so obstructed by rocks that logs could not be driven into the entrance of the stream; that owing to those obstructions, and the falls, and spreading out of the stream, as stated, it was impossible to drive logs through that stream before the improvements were made by Treat, and those claiming under him, by removing the obstructions, deepening the channel, &c., even if the brush and down trees had been removed; that many of those trees had been there a very long time, some of them "from time immemorial," and were a complete obstruction to the floating of logs in the stream.

Much evidence was introduced on both sides concerning the capability of the stream in its natural state; also on the point whether defendants did unnecessary damage to plaintiffs in driving their logs. through.

The presiding Judge instructed the jury, that if Cold stream was such a stream as the public would have an easement in for the driving of logs, on account of its inherent capacity for being so used, then the resolve of the State of Massachusetts, and the proceedings under it, the bond of Treat, and the conveyance to him, would have only the effect of a deed from the proprietor of the soil, which would convey the land only subject to the public easement; that the right of way was in the waters, and the plaintiff in such case would have no authority to prevent its exercise; that he could by law erect and continue his dams and mills, but was bound to provide a way of passage for the defendants' logs; that some streams are entirely private property, and some are subject to the public use and enjoyment; that the test has been sometimes held to consist in the fact whether they are susceptible or not of use as a common passage-way for the public. And, by request of plaintiffs' counsel, the Judge instructed the jury, " that if the stream were incapable in its natural state of being used to propel logs without the

erection of dams or other structures on plaintiffs' land, there could be no public servitude in it."

The Judge also instructed the jury, that the law, as established in this State, and which they would take for their guide, was, that "the true test to be applied in such cases, is whether or not a stream is inherently and in its nature, capable of being used for the purposes of commerce, for the floating of vessels, boats, rafts or logs—when a stream possesses such a character, then the easement exists, leaving to the owners all other modes of use not inconsistent with it;" that a stream might possess such a character, even though, when the forest was first opened on its shores, it were so obstructed by fallen trees, brush and drift wood, that neither vessels, boats, rafts or logs could be floated, through its course, upon its surface, until such obstructions had been removed; that, perhaps, many such streams, when the forests about them were first opened, would need such clearing out before they could be profitably used; and that it was a question for the jury to determine, from the evidence in the case, whether or not the stream was inherently and in its nature capable of being used for the purposes of commerce, for the floating of vessels, boats, rafts or logs.

That one of the elements of such capability might be, in the opinion of the jury, a sufficient fountain or head of water, and if so, was there such an one here?

That they would determine what obstructions existed upon this stream, and whether they were of such a nature as would take away from the stream its inherent capability; as, for example, whether a rock so situated as to be easily removed by a person wishing to drive, would deprive the stream of its inherent capacity for such use, when such rock might be the only obstruction in the stream.

That if they found that the stream possessed such inherent and natural capacity, the plaintiffs had no right to prevent the floating of logs through it, even though it possessed that capacity only at the time of the spring freshet; that defend-

ants had a right to drive their logs through whenever that right might be exercised, at any state of the water, and were not responsible to the plaintiffs for any damage they might thereby occasion, they having requested plaintiffs to remove their obstructions, and it having been refused, unless defendants had unreasonably or unnecessarily injured the plaintiffs' property; that defendants had a right to go through, and were not liable in damages for their acts, unless in so doing they unreasonably or unnecessarily injured plaintiffs' property; that, in such a stream, the right of the public exists, notwithstanding it may be necessary for persons floating logs thereon to use its banks.

Plaintiffs' counsel requested the Judge to instruct the jury, that if the stream was incapable of being used without traveling on its banks to propel the logs, there could be no public servitude in it, which instruction was refused: and the Judge then added, that if it was necessary to go on the banks more or less for the purpose of driving logs, that fact would not take from the stream its public character, if they found it capable in other respects of being used as a public stream.

The jury returned a verdict for defendants.

To all which rulings, instructions and refusals to instruct, the plaintiffs excepted.

*Rowe & Bartlett*, for plaintiffs, elaborately argued, in writing, the questions involved in the case. They maintained the following propositions:—

1. Cold stream is not navigable, in any sense of the term, at the site of the plaintiffs' mills, and no easement for running logs in it can exist, *publici juris*. Lord HALE's *De jure maris*, c. 23, (in note to) 6 Cow. 538–39; 3 Comyn's Dig. Tit. "Chimin" A. 1; 3 Kent's Com. 414; *Hooker* v. *Cummings*, 20 Johns. 90; *Adams* v. *Pease*, 2 Conn. 481; *Munson* v. *Hungerford*, 6 Barb. Sup. Ct. 265.

In the discussion of this point, the counsel referred to and reviewed *Brown* v. *Chadbourne*, 31 Maine, 9; *Berry* v. *Carle*, 3 Maine, 273; *Wardsworth* v. *Smith*, 11 Maine, 281; *Parker*

Treat *v.* Lord.

v. *Chapin,* 5 Pick. 199; *Esson* v. *McMasters,* 1 Kerr, (N. B.) 501; *Rowe* v. *Titus,* 3 Allen, (N. B.) 326.

2. The stream not being navigable, the plaintiffs had a right to erect their dam by virtue of the statute "for the encouragement of mills." R. S. of 1841, c. 126, § 1; *Wilson* v. *Forbes,* 2 Dev. (N. C.) 30; *State* v. *Godfrey,* 12 Maine, 370.

3. The Judge erred in instructing the jury that the stream was subject to public servitude, even though in its natural state logs could not be driven in it without the removal of rocks, and traveling on the banks to propel the logs. We contend that the case of *Brown* v. *Chadbourne,* 31 Maine, 9, does not authorize such an instruction, but on the contrary forbids it.

4. But, whatever the character of the stream, the evidence we offered shows a license from the State of Massachusetts to erect dams. *People* v. *Pratt,* 17 Johns. 195; *Crenshaw* v. *Slate River Co.,* 6 Randolph, 245; *Com.* v. *Breed,* 4 Pick. 460; *Boston and Roxbury Mill Co.* v. *Newman,* 12 Pick. 467; *Wellington & al., pet'rs., &c.,* (Cambridge common,) 16 Pick. 102–3–4; *Wilson* v. *Black Bird Creek Marsh Co.,* 2 Peters, 245; *King* v. *Montague & al.,* 4 Barn. & Cr. 598; *Com.* v. *Charlestown,* 1 Pick. 179, 182; Opinion of TANEY, C. J., in *Pennsylvania* v. *Wheeling Bridge Co.,* 13 How. 580–81.

*John A. Peters,* for defendants.

1. Upon the question of the rulings upon the public character of the stream, I cite and confidently rely upon *Brown* v. *Chadbourne,* 31 Maine, 9.

2. On the question of plaintiffs' title, I cite Parsons on Contracts, vol. 2, page 515; 11 Peters, 548 & 420; 13 How. 81; 6 How. 531; 10 Barb. 243.

The Court will notice that there is nothing in the case to show or even indicate that the plaintiffs cannot have the beneficial use of their grant, notwithstanding the public right.

MAY, J.—This is an action of trespass *quare clausum,* for breaking and entering the plaintiffs' close, consisting "of mills and four dams, with the mill-ponds, and mill-yards, and sites

Treat *v.* Lord.

appurtenant to said dams and mills," situate upon Cold stream, at Enfield, in the county of Penobscot; and for hoisting his gates and tearing away his said dams. The defendants justify the acts complained of, so far as proved, because, as they say, the said Cold stream is a public, navigable stream, upon and over which the public have a right of passage for driving logs, and the said acts were necessarily committed for the enjoyment of such right.

The case comes before us upon exceptions, taken to the rulings of the Judge who presided at the trial; and the first instruction relates to the legal effect of the deed from the Commonwealth of Massachusetts to Joseph Treat, under which the plaintiffs claim, and which was executed in pursuance of a resolve of the Legislature of that State, passed Feb. 7, 1820. In relation to this, the jury were instructed, "that if Cold stream was such a stream as the public would have an easement in for the driving of logs, on account of its inherent capacity for being so used, then said resolve, the proceedings under it, the bond of Treat, and the conveyance to him, would have only the effect of a deed from the proprietor of the soil, which would convey the land only, subject to the public easement; that the right of way was in the waters, and the plaintiffs would have no authority to prevent its exercise; that he could, by law, erect and continue his dams and mills, but was bound to provide a way of passage for the plaintiffs' logs."
It is contended, that by virtue of the proceedings under said resolve, inasmuch as the said Joseph Treat was bound by his bond to erect and put in operation a good and sufficient saw-mill and grist-mill on said Cold stream, within two years from the passing of said resolve, which must necessarily include the right to erect and maintain a dam or dams, across the same, it must have been the intention of the Legislature to have granted him full power and authority so to do. Said resolve authorizes the commissioners of the Land Office of that State to convey, and their deed does convey, to said Treat, his heirs and assigns, *all the right, title and interest* of said Commonwealth *in and to* a certain tract of land of the

contents of five thousand acres, describing it by metes and bounds, which include the *locus in quo.* This instruction, is based upon the fact, that the public had an easement in said stream, for the passage of logs, at the time of said convey-ance; an easement which conferred upon all persons having occasion so to use it, the right to do so, without any license or grant from said Commonwealth. It is true, the right to control, abridge, or even destroy such easement, then existed in said Commonwealth, by virtue of its sovereignty, or right of eminent domain, disconnected from, and not dependent upon its ownership of the soil; but until so exercised by posi-tive legislation, all persons might lawfully enjoy such ease-ment in common with said Commonwealth. It is otherwise in regard to the public lands. If any person enter upon them without license, he is a trespasser, and the Commonwealth may be disseized of such lands; but after the disseizor has acquired a title by lapse of time, his title will not be disturbed by any release or grant to other persons from the Common-wealth, whilst such rights as are a part of the State sove-reignty, conferred for the public good, cannot be lost by dis-seizin. The right of property is one thing, and the right to regulate or control the use of property, *pro bono publico,* by appropriate legislation, is quite another thing. The first *is property,* subject to be conveyed by deed or other legal mode of disposition; but the last is a part of the sovereign power itself. We are of opinion, therefore, that the resolve of the Legislature of Massachusetts, and the proceedings under it, including the bond and deed aforesaid, cannot fairly be con-strued as conveying any thing but the right of property to which they refer; that the said Commonwealth, at the time of said conveyance to Joseph Treat, had no such exclusive right of property in the easement, for the passage of logs, upon Cold stream, (if such easement existed,) as would pass by a grant of all its *right, title and interest in and to* the land over which said stream passes; and that by the deed to said Treat, conveying no rights to him other than the rights of property, which the grantors then had, he was not authorized by virtue

thereof, nor are those claiming under him, to use exclusively or to destroy the public easement then existing upon said stream.

It is now further contended, that the plaintiffs had a right to erect and maintain their dams by virtue of the statute for the encouragement of mills. R. S., c. 126, § 1. This point does not appear to have been raised at the trial. The Judge neither made, nor was requested to make any ruling relating to it. It is not perceived, however, how the proposition contended for can be sustained. The statutes in relation to the right of erecting mills and mill-dams and flowing lands has never been "so construed as to justify or excuse the erection of a dam in such a manner as to overflow a public highway already appropriated and in actual use, and thereby render it impassable." The contrary has been directly held. *Commonwealth* v. *Stevens,* 10 Pick. 247.

The reasons for such decision seem to apply with equal force to a public right of way or easement in a river, and where there is the same reason there should be the same law. In the case before the Court, it does not appear that the erection of mills and dams upon said stream would necessarily interfere with the rights of the public in driving logs thereon, especially, if suitable provisions were made therefor; if so, the rights of the mill owner and the public could both be enjoyed without any conflict between them. No error is perceived in the instructions of the Court relating to the plaintiffs' right to maintain their dam.

2. The great question of fact in the case was, whether said stream was subject to such public servitude or not; and the jury were instructed, that in determining this question, "the true test to be applied in such cases is, whether or not a stream is inherently and in its nature capable of being used for the purposes of commerce, for the floating of vessels, boats, rafts, or logs; and when a stream possesses such a character, then the easement exists, leaving to the owners all other modes of use, not inconsistent with it." This is found to be in exact accordance with the law as laid down by the

Court in the case of *Brown* v. *Chadbourne*, 31 Maine, 9. Considering the importance of this rule of law to the lumbering commerce of our State, and the fact that it has been so recently fully considered and determined by this Court, after elaborate argument from able counsel on both sides, we do not feel that the ingenious reasons now offered in the argument for the plaintiffs are sufficient to require us to overrule it. We think it is clear, also, and in conformity with the case just cited, that no accidental or intentional obstructions in the stream which were not there in its natural state, would legally take from it its inherent and natural capability of being used as a passage way for the purposes of commerce. The whole question of inherent capacity was properly left to the jury. They were permitted to look at the whole evidence in the case; at the width and depth of the stream; at the quantity of water flowing in it at the different seasons of the year; and at all the obstructions or obstacles in the way of its use as a passage-way for logs or other property, whether there originally, or by accident, or otherwise; and from all these, with the other evidence in the case, they were left free to determine the inherent and natural capacity and character of the stream, so far as regarded its facilities for floating logs, to places for manufacture or sale, and thus aiding in the demands of commerce. They were to determine what obstacles existed, and their effect; as, for example, whether a rock, if any such existed, being the only obstruction in the stream, and so situated that it might be easily removed, would take away from the stream its inherent capability. They were not instructed, that a rock, originally in the stream, such as would render the stream in its natural state incapable of floating logs, even though it might be easily removed, would not deprive the public of all right to use the stream as a passageway; but the existence and effect of such a rock, as well as of all others, was left wholly to the jury, and no request for any instruction as to the legal effect of such a rock upon the natural capacity of the stream was made. If any instruction was desired upon this point it should have been asked. The

example given by the presiding Judge to the jury, left them with precisely the same right to determine the true capacity of the stream as if no such example had been given. There is nothing in the instructions upon this point as to the capacity of the stream which is not in accordance with the law.

3. The instruction, "that in such a stream the right of the public exists, notwithstanding it may be necessary for persons floating logs thereon to use its banks," is directly settled in the case of *Brown* v. *Chadbourne*, before cited; and the reasons there stated for the existence of such right, notwithstanding such necessity, are satisfactory to us. But the Judge was requested to instruct the jury, "that if the stream was incapable of being used without traveling on its banks to propel the logs, there could be no public servitude in it," which instruction was refused. The legal proposition contained in the request, is undoubtedly a sound one. The stream, in order to have the character of a public highway, must, in and of itself, have a capacity for floating logs. Such a stream, as well as our larger rivers, will, as experience has universally shown, from its windings, and the rush of its waters especially in times of freshets, cast many of the logs which float upon its bosom, upon its shores, intervales and banks, thereby rendering it necessary to go upon such uplands for the purpose of making a clean drive. Such incidental necessity neither enlarges nor diminishes the natural capacity of the stream, nor in any way affects its public character. To meet such necessity, it is provided by the Revised Statutes, c. 67, § § 10 and 11, that all logs or other timber, lodged upon any lands adjoining any of the waters within this State, shall, in certain contingencies, and upon certain conditions, be forfeited to the owner or occupier of such lands; and that the owner of such timber may at any time before such forfeiture, enter on said lands and remove the same, by tendering a reasonable compensation for all damages as the statute requires. While, therefore, it is true, that persons driving logs may go upon the banks of our public streams and rivers, as necessity may require, it is also true, that a stream, which is so small and

shoal in its bed, that no logs can be driven in it, without being propelled by persons traveling on its banks, is private property, and not subject to such public servitude as is claimed in this case.

By the common law it is clear, that the public have no right to go upon the banks of ancient navigable rivers for the purpose of towing; and it is said by the Court in the case of *Brown* v. *Chadbourne,* before cited, that "where a river cannot be used without towing, or going upon its banks to propel what is floating, such fact would evince its want of capacity for public use; and we think such fact is conclusive, that no such public servitude exists. The right of the public so to use a stream or river for the purposes of commerce, rests in the intrinsic capability of its waters for such use, and is in no way dependent upon the necessity of using its banks. The Judge, who tried this cause, seems so to have understood the law; for, he told the jury, "if it was necessary to go upon the banks more or less, for the purpose of driving logs, *that fact would not take from the stream its public character,*" if it was in other respects capable of being so used; and besides, the test which he gave for determining its public character, being that of inherent and natural capacity, would seem to exclude the idea of having any inherent natural want of such capacity to be supplied by any extraneous aid from persons traveling on its banks. It is not the right of counsel to have requested instruction, in itself proper, given to the jury in the precise words of the request. It is sufficient, if it be substantially given in any form, so that the jury may not misunderstand the law of the case.

It will be found, also, from an examination of the testimony, as reported in the bill of exceptions, that there was no particular evidence touching the question whether the public use of the stream, as a passage-way for logs, was dependent in the least degree upon any propelling power from the banks; and the Judge was under no obligation, when requested, to state any legal proposition, however correct it might be, which had no connection with the proof in the case. The jury,

under the instructions given, must have found that the stream had a sufficient *inherent natural capacity* for the floating of logs; and if they found this, it was not necessary to determine, or that they should know, what would be the effect of an insufficiency of such capacity without a propelling force from the banks, especially in a case where there was no evidence that such force was necessary or had ever been applied. We think, therefore, that no cause exists for setting aside the verdict, because such requested instruction, in the form stated, was not given; and no error being found in any other ruling, the exceptions must be overruled, and there must be judgment on the verdict. *Exceptions overruled.*

TENNEY, C. J., non-concurred.

APPLETON and GOODENOW, J. J., concurred.

HATHAWAY, J., concurred in the result.