# CHARLESTOWN.

## GASTON *v.* MACE.

*(BRANNON, JUDGE, Absent.)

Submitted June 11, 1889.—Decided September 13, 1889.

1. FLOATABLE STREAMS—HIGHWAYS.

The public in this State have a right to use as highways not only tidal rivers, in which the tide ebbs and flows, and fresh water rivers capable of being profitably used to carry on commerce in their natural state without artificial improvement, but also floatable streams, that is, such streams as are capable of being profitably used by the public in their natural state to float logs or timber or the products of mines or tillage to markets or mills.

*Rendered judgment below.

2. FLOATABLE STREAMS—HIGHWAYS.

> To be a floatable stream so as to entitle the public to use it as a public highway, the stream need not be at all times capable of floating logs, but it will suffice, that, when the water is high, it is thus capable for such a length of time as would make it useful and profitable for the public to so use it as a highway to float logs to mill or market.

Statement of the case by GREEN, JUDGE:

This was an action on the case brought in the Circuit Court of Lewis county in November, 1883. The declaration was filed at January rules, 1884, and contained two counts. The first count stated, that the plaintiff, Gaston, was possessed of a certain close on both sides of Stone Coal creek in said county and of a water-mill, water-wheels, head-gate with a mill-dam across said Stone Coal creek within his said close, formed by a wooden and stone structure, and abutting on each side of said creek within said close, which mill had been, of right ought to have been and still of right ought to be supplied with water for the working thereof, flowing down said Stone Coal creek into said mill-pond, owned by the plaintiff, in the said creek, formed by said wooden and stone structure, the dam aforesaid and flowing therefrom or into the head-gate aforesaid and into the water-wheel of the plaintiff aforesaid, which water so accumulated in the said mill-dam was of right used and enjoyed by the said plaintiff for the working of his mill aforesaid. Yet the defendants heretofore, to wit, in the year 1880, and since on divers days, threw, placed and deposited in the bed and channel of the said Stone Coal creek, above and near the said mill, large quantities of saw-logs, timber and rubbish, that said saw-logs, timber and rubbish were washed, floated and carried into the said mill-dam of the said plaintiff and were carried and floated in and upon said wooden and stone structure of the plaintiff, so that by the pressure of the said logs, timber and rubbish the said wooden and stone structure was forced from its position across the stream aforesaid into the channel of said creek, and was wholly destroyed and lost to the said plaintiff, and his mill-dam occasioned by said structure ceased to exist, and the plaintiff was thereby deprived of the use of the water of the said creek to run and operate his mill aforesaid.

The second count in addition to the facts stated in the first count stated, that said defendants placed and deposited upon the bed and channel of the said Stone Coal creek and upon the banks of the same divers saw-logs and timber, which were washed, floated down and conducted down said creek, lodged and rested upon said structure, and by the pressure of the same carried away and wholly destroyed the wooden and stone structure aforesaid, by reason whereof the said plaintiff has been injured, and sustained damages to the amount of $1,000.00, and therefore he sues.

To this declaration, and each count thereof, the defendants demurred, and the plaintiff joined in the demurrer. The court overruled said demurrer, and the defendants pleaded "Not guilty," and put themselves upon the country, and the plaintiff did likewise, and issue was joined, and in July, 1885, the jury found a verdict for the defendants, and on July 14, 1885, the court pursuant to this verdict rendered a judgment, "that the plaintiff take nothing by his suit, and that the defendants go thereof without day and recover from the plaintiff their costs in this behalf expended," and the following memorandum was entered of record:

"The plaintiff excepted to certain opinions of the court in this cause, and tendered three bills of exceptions numbered one, two, and three respectively, which were signed by the court and ordered to be made a part of the record in this cause."

The following are the three bills of exceptions referred to in and made a part of the record:

"Bill of Exceptions No. 1. *Isaac M. Gaston* v. *Geo. Mace* and *R. T. Lowndes*. Trespass on the case. Be it remembered that on the trial thereof there was evidence to the jury tending to prove that the mill-dam in the declaration mentioned was, at the time of the alleged grievances complained of, at the same place on Stone Coal creek that a mill-dam had been from the year 1818 continuously to the commission of said grievances, and that from that time to the commission of said grievances had been rebuilt and repaired without material change in extent or dimensions; that said creek was not, in its natural condition, sufficient to float vessels or other craft, but that saw-logs could be floated upon

the occurrence of floods therein by rains and melting snows; that said creek had not been used for floating saw-logs to its mouth at the West Fork river for market until the year 1880, and then, and since, and upon the occurrence of such floods for a short time, but that large quantities of logs had been floated down said stream since that time by a number of persons, and that said creek was useful to the public for that purpose, and that prior to 1880 some logs had been floated down said stream to said mill, there to be converted into lumber, and that the injury complained of by the plaintiff, if done at all by the defendants, was done while engaged in floating saw-logs down said stream, and over said dam, to market; that above said mill-dam there had been, on the line, between farms, and inside of farms above, water gaps across said creek for a number of years up to and prior to the time of the alleged grievances. And before the jury retired to consider of their verdict the plaintiff moved the court to give to the jury the following instructions: 'If the jury find that the plaintiff's dam was at the same place, and of like character in dimensions and height, for a period of twenty years or more, and had been so used for a period of twenty years or more, and further find that Stone Coal creek, in which said dam existed, was floatable for saw-logs and not for other purposes of navigation, still the plaintiff has a prescriptive right to have such dam, and so hold and use the same, notwithstanding said stream is floatable for saw-logs, and not for other purposes of navigation.' And the defendants objected to the same, and thereupon the court sustained said objection, and refused to give said instructions to the jury, to which action of the court in sustaining said objections, and in refusing to give said instructions to the jury, the plaintiff excepts, and tenders this, his bill of exception, which is signed by the court, and ordered to be made a part of the record hereof."

"Bill of Exceptions No. 2. *Isaac M. Gaston* v. *Geo. Mace* and *R. T. Lowndes.* Trespass on the case. Be it remembered that on the trial of this cause there was evidence to the jury tending to prove, as stated in bill of exceptions taken by the plaintiff, No. 1, and the court certifies, that there was no evidence to the jury that Stone Coal creek, by

reason of its natural capacity, was navigable for floating lumber or other commercial goods, but was for logs, as stated in bill of exceptions No. 1 ; and the defendants, before the jury retired, moved the court to give to the jury the following instructions, marked Nos. 4 and 5, respectively. Instruction No. 4 is as follows : 'If the jury believe that Stone Coal creek is, and has always been, by reason of its natural capacity, navigable for floating lumber, logs, and other commercial goods, the right of the public to use the same for such purpose can not be lost or forfeited by reason of non-user of it, or maintaining an obstruction thereto, for any length of time, and under such circumstances the plaintiff could not acquire a right to maintain a dam or other obstruction to the public use of said stream.' Instruction No. 5 is as follows : 'In determining the question of the navigability of Stone Coal creek, it is the valuable, more than the continued, capacity that is to be considered. The real question is, can it be made a valuable and beneficial aid to the public in getting the products of the country to market?' And thereupon the plaintiff objected to each of said instructions, but the court overruled said objections, and gave to the jury the said instructions No. 4 and No. 5 ; to which ruling of the court in overruling said objections and giving said instructions the plaintiff excepts, and tenders this, his bill of exception, which is signed by the court, and ordered to be made a part of the record hereof."

"Bill of Exceptions No. 3.   *Isaac M. Gaston* v. *Geo. Mace* and *R. T. Lowndes.*   Trespass on the case.   Be it remembered that the plaintiff entered his motion to set aside the verdict found by the jury herein, and to grant a new trial, because the court refused to give the instructions to the jury set out in bill of exceptions No. 1, taken by the plaintiff, and because the court overruled the objections of the plaintiff to instructions numbered 4 and 5, asked by defendants, and set out in bill of exceptions No. 2, taken by plaintiff, and because the court gave to the jury said instructions numbered 4 and 5 ; but the court overruled the motion to set aside said verdict and to grant a new trial, and thereupon caused judgment to be entered according to the verdict ; to which ruling of the court the plaintiff excepts, and tendered this, his bill of ex-

ceptions, which is signed by the court, and ordered to be made a part of the record hereof."

To this judgment rendered by the court on July 14, 1885, the plaintiff, Isaac M. Gaston, has obtained a writ of error and *supersedeas*, assigning as errors that the court refused to give plaintiff's instruction No. 1, and gave defendant's instructions No. 4 and No. 5; and that the court overruled the plaintiff's motion to set aside the verdict of the jury and award him a new trial.

*J. Brannon*, for plaintiff in error.

*C. Boggess and L. Bennett*, for defendent in error.

GREEN, JUDGE:

This was an action of trespass on the case, brought by the plaintiff, the owner of a mill and mill-dam on Stone Coal creek in Lewis county. The claim of the plaintiff was that the defendants placed in this creek above said mill a number of saw-logs, which were floated down the stream upon which was his dam, so that by the pressure and weight thereof the dam was destroyed, and he was deprived of the use of the water in said creek for operating his mill, to his damage. The action is based on the plaintiff's claim of an exclusive right to use the water of this creek within his close, as though it were a private stream. The jury and the court below rendered a verdict and judgment for the defendants, evidently basing their action on an ignoring of the plaintiff's claims, and on an assumption that the creek was a navigable stream of this State, which the public and defendants as a portion of the general public had a right to use as a public highway by floating logs down the stream to market. And as there was no claim or proof that the defendants exercised this right improperly or negligently, and as the damage done the plaintiff by the breaking of his dam was an injury which was the result of his improperly obstructing a public highway, he has no right to complain of the defendants, who, when this injury occurred, were only using this public highway on Stone Coal creek in a proper manner, and as any of the public had a right to use the same.

Does the record show that Stone Coal creek was a private

stream, and that the plaintiff had an exclusive right to use the water of this stream within this close? If so, the action and judgment of the court below must be reversed; otherwise, it must be affirmed.

Whether a stream was navigable or non-navigable, in England, was generally determined in the old cases by the fact that the tide ebbed and flowed in the stream, and doubtless the tide does ebb and flow very generally in the navigable streams of the small island of Great Britain. But in the United States, in most of the navigable streams the tide does not ebb and flow. The great mass of the commerce of the United States is transported on waters in which the tide does not ebb and flow. And even when it is moved upon streams in which the tide does ebb and flow, it is only for a comparatively short distance, while for nearly the whole distance it has been moved from above the tide-water section of the country. Indeed, this is the case in many States of the Union that carry on a large commerce, and in which there is no tide-water,—our own State for instance. But in none of these States has it ever been held that these are not navigable streams, simply because there was no ebb or flow of the tide. In the United States there are three classes of navigable streams: (1) Tidal streams, that are held navigable in law, whether navigable in fact or not: (2) those that, although non-tidal, are yet navigable in fact for "boats or lighters," and susceptible of valuable use for commercial purposes: (3) those streams which, though not navigable for boats or lighters, are floatable, or capable of valuable use in bearing logs or the products of mines, forests and tillage of the country they traverse to mills or markets.

With reference to the first of these classes, tidal streams, wherever the common-law prevails, are held to be navigable. By the old English cases it is decided, that all tidal waters are navigable to the extent of the flow and re-flow of the tide, and the absolute property-interest in the same in their course and the right of soil of owners of the land bounded by such tide-water streams extends only to high-water mark. But above the line where the tide ceases to have any effect, the rule of property is reversed, and the property in the soil or bed of the river is in the riparian proprietors; and this is

true also of all streams not tidal, that is, not legally navigable. See *Elder* v. *Burrus*, 6 Humph. 358, 366; *Stuart* v. *Clark's Lessee*, 2 Swan 9. In the latter case, McKINNEY, J., in delivering the opinion of the court, pages 13 and 14, says:

" The rule of the common law as to what is a navigable river, namely, the flow and re-flow of the tide, was declared by this court in *Elder* v. *Burrus*, 6 Humph. 358, 366, to be inapplicable in Tennessee. And such has been the course of decisions in some of the other American courts. This criterion, as applied to England, may be appropriate and practical, because, perhaps, it embraces pretty much the entire extent of all rivers which in point of fact are navigable; but it would be most absurd in its application to our large, fresh water rivers, which, though not subject to the influence of the tide, are yet fitted by nature in their ordinary state for all the common purposes of navigation. * * * According to the civil law, navigable rivers are not merely rivers in which the tide flows and re-flows, but rivers capable of being navigated; that is, navigable in the common sense of the term." See Ang. Water-Courses, § 550.

With reference to the second of these classes of navigable streams it will be observed from its definition, that, whether fresh water streams be or be not navigable, is a question of fact, and as such those, who claim such non-tidal streams to be navigable, have on them the burden of proving that such streams are in fact navigable for boats or lighters and susceptible of valuable use for commercial purposes in their natural state, unaided by artificial means or devices. The stream, too, to belong to this second class of navigable streams, must be thus capable of being navigable, not all the time, but for such length of time during the year as will make such stream valuable to the public as a public highway. But the fact, that the stream can not be so used at certain seasons of the year, will not destroy the public right of navigation or make such streams non-navigable. See *McManus* v. *Carmichael*, 3 Iowa 1; *Rhodes* v. *Otis*, 33 Ala. 578; *Morgan* v. *King*, 35 N. Y. 459; *Berry* v. *Carle*, 3 Greenl. 269; *Wadsworth* v. *Smith*, 11 Me. 276; *People* v. *Tibbetts*, 19 N. Y. 523; *Reynolds* v. *McArthur*, 2 Pet. 417; Wood, Nuis. § 587.

The very definition of the third class of navigable streams shows, that these streams would not be included in the common-law definition of a navigable stream; that is, one in which the tide ebbs and flows. Nor could it come within the civil-law definition of a navigable stream, which is capable of being navigated by boats or lighters, and on which commerce may be carried on. Navigable streams of this class are generally called "floatable" streams; and, though the public has a right to use them as a public highway by floating logs and other products of forests, mines and tillage down them to mills and market, yet the riparian owners along such streams own the bed of them, as well as their banks, differing in this respect from other navigable streams. The respective rights on such floatable streams of the public and the riparian owners are well stated in *Lancey* v. *Clifford*, 54 Me. 487. DICKERSON, J., in delivering this opinion says:

"A stream, which in its natural condition is capable of being used for floating logs, lumber and rafts, is subject to the public use as a highway, though it be private property and not strictly navigable. This right of the public, however, must be exercised in a reasonable manner, since each person has an equal right with every other person to its enjoyment, and the enjoyment of it by one, necessarily, to a certain extent, interferes with its exercise by another. What constitutes reasonable use by the public depends upon the circumstances of each particular case, as the occasions for the use are so numerous and diverse that no positive rule can be laid down to regulate it in every instance with anything like entire precision. The various purposes for which such a highway is used by the public, whether for transporting merchandise, rafting, driving, or booming logs, or securing them at the mill afterwards if necessary, require so much space as temporarily to obstruct the way; but if parties so conduct themselves in this business as to discommode others as little as is reasonably practicable, the law holds them harmless. If the rule of law was otherwise, the right of way in many cases could not be available for any useful purpose. *Brown* v. *Chadbourne*, 31 Me. 9; *Davis* v. *Winslow*, 51 Me. 264.

"As respects the rights of the land-owner to streams, it is

to be observed that while he has a property in the stream, he has no property in the water itself, aside from that which is necessary for the gratification of his natural or ordinary wants. All the rest of the water is *publici juris*. *Aqua currit et debet currere ut currere solebat.* The right of enjoying this flow without disturbance, interference or material diminution by any other proprietor is a natural right, and is an incident of property in the land, like the right the proprietor has to enjoy the soil itself without molestation from his neighbors. The right of property is in the right to use the flow, and not in the specific water. Each proprietor may make any use of the water flowing over his premises which does not essentially or materially diminish the quantity, corrupt the quality, or detain it so as to deprive other proprietors or the public of a fair and reasonable participation in its benefits. *Race* v. *Ward*, 30 Eng. Law & Eq. 187; *Johnson* v. *Jordan*, 2 Metc. 239; *Dickinson* v. *Canal Co.*, 7 Exch. 282; *Tyler* v. *Wilkinson*, 4 Mason 397.

"This rule does not require that there shall be no diminution, abstraction or detention whatever by the upper or lower riparian proprietor, as that would be to prevent all reasonable use of it. The same principle in regard to use by the riparian proprietors applies as in the public use of the stream as a highway; it must be a reasonable use, and not inconsistent with the reasonable enjoyment of the stream by others who have an equal right to its use. Reasonable use is the touch-stone for determining the rights of the respective parties. Thus in considering this subject we find the public right of way over the stream, and the land-owner's right of soil under it, and his right to use its flow. The rights of both these parties are necessary for the purposes of commerce, agriculture, and manufactures. The products of the forest would be of little value if the riparian proprietors have no right to raise the water by dams, and erect mills for the manufacture of these products into lumber. The right to use the water of such streams for milling purposes is as necessary as the right of transportation. Indeed, it is this consideration that oftentimes imparts the chief value to the estate of the riparian proprietors, and without which it would have no value whatever in many instances. Each right is the hand-maid of civilization, and

neither can be exercised without in some degree impairing the other. This conflict of rights, therefore, must be reconciled. The common law, in its wonderful adaptation to the vicissitudes of human affairs, and to promote the comfort and convenience of men as unfolded in the progress of society, furnishes a solution of this difficulty by allowing the owner of the soil over which a floatable stream which is not technically navigable passes to build a dam across it, and erect a mill thereon, provided he furnishes a convenient and suitable sluice or passage-way for the public by or through his erections. In this way both these rights may be exercised without substantial prejudice or inconvenience."

These views are sustained not only by reason, but also by the decided weight of American authorities. See *Brown* v. *Chadbourne*, 31 Me. 9; *Knox* v. *Chaloner*, 42 Me. 157; *Munson* v. *Hungerford*, 6 Barb. 268; *Burrows* v. *Gallup*, 32 Conn. 501; *Volk* v. *Eldred*, 23 Wis. 410; *Moore* v. *Sanborne*, 2 Mich. 523; *Wadsworth* v. *Smith*, 11 Me. 278; *Neaderhouser* v. *State*, 28 Ind. 270; *Veazie* v. *Dwinel*, 50 Me 479; *People* v. *Platt*, 17 Johns. 195; *Curtis* v. *Keesler*, 14 Barb. 511; *Hubbard* v. *Bell*, 54 Ill. 112; *Treat* v. *Lord*, 42 Me. 552; *Walker* v. *Shepardson*, 4 Wis. 485; *Stuart* v. *Clarke*, 2 Swan. 9; *Weise* v. *Smith*, 3 Or. 445; *Felger* v. *Robinson*, Id. 458; *Rhodes* v. *Otis*, 33 Ala. 578; *Com.* v. *Chapin*, 5 Pick. 199 (16 *Am. Dec.* 386.)

The old English cases do not decide that any stream is navigable or a public highway, unless the tide ebbs and flows in such stream, and then when it is thus a tidal stream it is held to be a navigable stream, in law, whether in fact it be or be not navigable. But, as we have shown, the civil-law held as navigable every stream, whether thus tidal or not, if it is in point of fact navigable by boats and lighters, so that it was in its natural state capable of being used by the public profitably to carry on commerce in the usual manner; and this has been universally held to be law in the United States, and though, perhaps, it would be difficult to find such decisions in England, yet, I apprehend, it has always been the common-law of England, though the occasion to so declare it may not have arisen in any English case. Thus Lord Hale, who is the highest English authority on this subject, in chapter 3 of his treatise *De Jure Maris* says:

"There be some streams or rivers that are private not only in property or ownership but in use, as little streams and rivers, that are not of common passage for the king's people. Again, there be other rivers as well fresh as salt, that are of common or public use for carriage of boats and lighters; and these, whether they are fresh or salt, whether they flow or re-flow or not, are *prima facie pablici juris,*—common highways for men or goods or both from one inland town to another. Thus the rivers of Wey, of Severn, and of Thames, as well above the bridges and forts as below, as well above the flowings of the sea as below, and as well where they have come to be private property as in what part they are the king's property, are public rivers *juris publici.*"

The third class of public highways—floatable streams—are not, so far as I know, recognized in England, and I doubt whether they, in point of fact, exist in England. But they are very common in the United States; and as we have seen, while they are the private property of the riparian owners, yet the public has a right to use them as public highways to float their lumber and other products of their land to mill or market, and the riparian proprietor can not so use these streams as unreasonably to incommode and hinder the public from using them for such floating purposes.

We will now apply these principles of law to the case under our consideration. The court below did not err in refusing to give the instruction asked for by the plaintiff. It was: "If the jury find that plaintiff's dam was at the same place, and of like character and dimensions and height, for a period of twenty years or more, and further find that Stone Coal creek, in which said 'dam existed, was floatable for saw-logs and not for other purposes of navigation, still the plaintiff had a prescriptive right to have such dam, and so hold and use the same, notwithstanding said stream is floatable for saw-logs, and not for other purposes of navigation." In such floatable stream as is described in this instruction the plaintiff, a riparian proprietor, had a right, as we have seen, to build a mill, and erect a dam across the stream to accumulate water to run his mill; and this right belonged to him as a riparian proprietor, and did not depend upon his

having acquired it by prescription by the use of such dam and mill for twenty years.

It will be observed that Lord Hale, in laying down the rights of the riparian owners and of the public in such streams, makes no mention of prescription or length of time by which the rights are obtained either by the public or by the riparian owners. But he speaks of the actual use in fact of the stream as a public highway as establishing the right of the public to such use; and this for the obvious reason that such actual use by the public of such stream as a public highway proves, that such stream is capable of such use by the public, and it is this which makes it a public highway, though the public has not before exercised its rights. So we have seen the riparian owner has a right to use the banks of such stream and the flow of water in it for his private property, though he has not heretofore exercised this right, if he exercise it in such a reasonable manner as not to interfere unnecessarily in an injurious way with the public right to use such stream as a public highway for floating logs down such stream to market or to mills.

There is nothing in this record, from which the jury could infer that the defendants used this Stone Coal creek in an unreasonable manner as a public highway down which to float logs to market or mills. On the contrary, the inference might be drawn, that the plaintiff or riparian owner did undertake to use the flow of the water in this creek in an unreasonable manner, thereby unnecessarily prejudicing the rights of the defendants, as a portion of the public, to use such stream to float their logs down the same to mills or markets. That their right of so floating their logs was so unnecessarily prejudiced appears from the fact, that these logs so floated lodged against a dam, which the plaintiff had built across the stream, and were thus detained, till by their pressure they broke the dam down. Such a dam on such a stream was a public nuisance, unless the owner had provided suitable sluices to allow logs floated down the creek to pass around or through said dam, and the record does not state that any such sluices were made and kept up by the plaintiff. On the contrary the fact, that the logs, by their weight, broke the dam, would seem to indicate clearly,

that there were no sluices, by which they could have passed through, or they could not have carried away this dam of the plaintiff; for, had there been such sluices these logs would hardly have accumulated in this dam till by their pressure the dam was broken. The erection of such dam across such floatable stream, without making or keeping such suitable sluices for the passage around or through such dam of logs floating in the stream, is a nuisance.

It was held in *Brown* v. *Chadbourne*, 31 Me. 9, which was a case in which an individual recovered against the riparian owner of land along a floatable stream not, properly speaking, navigable, for maintaining a dam across such stream without maintaining suitable sluices around or through it for the passage of logs. This case would closely resemble the case before us, if the defendants had sued the plaintiff for injuring them by unreasonably interfering with their right of floating logs. The law is so well stated by WELLS, J., in delivering the opinion of the court in that case, that I can not better express it than by quoting portions of his opinion. He says:

"This is an action on the case for erecting and maintaining a dam across a stream called "Little River," and obstructing the passage of the water and the plaintiff's logs. The river is about three miles in length, and runs from Boyden's lake to the tide-waters. It varies in its width from seven or eight feet to three or four rods; and it has been used many years for floating logs and rafts, and sometimes boats. Within twenty years, several dams and mills have been erected upon it. The plaintiff disclaimed the right to recover upon the ground of prescription or user, but claimed it because the stream was a public one in its natural state. The jury were instructed that, it being a fresh water stream, the presumption is that it is private property, and the burden is on the plaintiff to establish the contrary by satisfactory proof that it is a navigable or floatable river, and, in its natural condition, capable of being used for running logs. The rule of the common-law, that riparian proprietors own to the thread of fresh water rivers, has been adopted in this and many other states of the Union. *Berry* v. *Carle*, 3 Greenl. 269. *Spring* v. *Russell*, 7 Greenl. 273. The first question

that arises is, it being conceded that.the bed of the river belongs to the owners of the land on either side, can a right to the use of its waters be obtained, unless that use has been continued twenty years,—the ordinary length of time for the acquisition of an easement? In *Berry* v. *Carle*, 3 Greenl. 269; *Shaw* v. *Crawford*, 10 Johns. 236; *Scott* v. *Wilson*, 3 N. H. 321.—the right is considered as dependent on long usage."

He then quotes what is laid down by Lord Hale in his celebrated treatise *De Jure Maris*, above stated, and makes on it this comment: "He makes no mention of prescription or length of time by which the right is obtained, but of the actual use in fact, as indicating public rivers."

In *Wadsworth* v. *Smith*, 11 Me. 278, the doctrine is stated by Parris, J., that when a stream is naturally of sufficient size to float boats or mill-logs, the public has a right to the free. use for that purpose. But such little streams or rivers as are not floatable, that can not in their natural state be used for the carriage of boats, rafts, or other property, are wholly and absolutely private; not subject to the servitude of the public interest, not to be regarded as public highways by water, because they are not susceptible of use as a common passage for the public. The same principle was stated by Mellen, C. J., in *Spring* v. *Russell*, 7 Greenl. 273; and is also recognized in Angell, Tide-Waters, 75; *Palmer* v. *Mulligan*, 3 Caines, 307. The distinguishing test between those rivers which are entirely private property and those which are private property subject to the public use and enjoyment consists in the fact, that they are or are not susceptible of use as a common passage for the public. Per Spencer, C. J., in *People* v. *Platt*, 17 Johns. 216; *Hooker* v. *Cummings*, 20 Johns. 90. The right of passage and of transportation upon rivers not strictly navigable belongs to the public by the principles of the common-law. Per Parker, C. J., in *Com.* v. *Chapin*, 5 Pick. 199. This subject was very fully considered with great ability in *Esson* v. *McMaster*, in the province of New Brunswick, 1 Kerr, 501, deciding the rule of law as it is stated to be in *Wadsworth* v. *Smith*, 11 Me. 278. The case of *Rowe* v. *Titus*, 1 All. (N. B.) 326, in that province, was decided upon the same principle. See, also, *Adams* v. *Pease*, 2 Conn. 481; *Carson* v. *Blazer*, 2 Bin. 475; *Shrunk* v. *Navigation Co.*, 14 Serg. & R. 71.

If a stream could be subjected to public servitude by long use only, there are many large rivers in newly-settled States, and some in the interior of this State, of which the public would be deprived of the use, although nature has plainly declared such rivers to be public highways. The true test, therefore, to be applied in such cases is whether a stream is inherently in its nature capable of being used for the purpose of commerce for the floating of vessels, boats, rafts or logs. When a stream possesses such a character, then the easement exists, leaving to the owner of the bed all other modes of use not inconsistent with it; for in this State the rights of public use have been carried so far as to place fresh water streams on the same ground as those in which the tide ebbs and flows and which alone are considered strictly navigable at common-law, and to exclude the owners of the banks and beds from all property in them. In some states of the Union such a rule has been established by judicial decisions, and in others by legislative acts.

It is contended that to show a river is public, it is not enough to prove that logs may be floated down at a certain season of the year, when it is affected by a freshet, but it should have that capacity in its natural and ordinary state at all seasons of the year. None of the authorities require the stream to possess the quality of being capable of such use during the whole year. A distinguishing criterion consists in its fitness to answer the wants of those whose business require its use. Its perfect adaptation to such use may not exist at all times, although the right to it may continue, and be exercised whenever an opportunity occurs. In many rivers, where the tide ebbs and flows, the public are deprived of their use for navigation during the re-flux in their waters. A way, over which one has a right to pass, may be period-ically covered with water. In high northern latitudes most fresh water rivers are frozen over during several months of the year; even some tide-waters are incapable of any bene-ficial use for purposes of commerce in the season of winter, owing to the accumulation of ice.

The lapse of time, during which a dam has been used across a floatable stream by a riparian owner, can give no prescriptive right to such use as against and to the prejudice

of the public use, though it might give a right to keep up such dam as against another riparian owner by prescription. If the law was otherwise, in many parts of the United States, and in portions of this State, the public would necessarily lose the use of many floatable streams, in which riparian owners have kept up dams for more than twenty years before the public had any occasion to float logs down them, because the banks of the stream remained unsettled, and the timber on such stream, therefore, entirely uncut. The riparian owner of such dam could never acquire by prescription an exclusive right to the use of such stream, as if it were a private stream, as against the public. Therefore, this instruction asked by the plaintiff and refused by the court below was properly refused, if it meant to declare the law to be that the plaintiff had or could acquire the exclusive right to use the water of Stone Coal creek as if it were a private stream as against the public use of it as a floatable stream, by maintaining a dam across it for twenty years. And if this instruction did not mean this, but merely "that the plaintiff had, as riparian owner, the right to maintain and construct a dam, to use the water of this stream for his mill, but in such a way as to be consistent with the right of the public to use the water of this stream to float logs to market down it," then this was correct law; but the instruction ought to have been refused if it was believed to have been immaterial, and calculated to mislead the jury.

We have seen that if, as assumed in this instruction, Stone Coal creek is a floatable, but not strictly navigable, stream, the plaintiff, as a riparian owner, had a perfect right to erect his mill and to build his dam, provided he did not unreasonably obstruct or interfere with the public use of this stream in times of flood. This reasonable use of the water of this stream by the plaintiff, and of his dam across the same, would have existed had the plaintiff made and kept in repair suitable sluices in or around said dam, through which logs might pass while being floated down this stream. This he did not do, but, on the contrary, it would seem from the record, he unnecessarily obstructed the passage of logs floating down this stream. His dam was broken as the result of his illegal and improper obstruction of the logs floating in this stream; and he had therefore no right to recover in this suit.

The court below did not err in giving the instructions Nos. 4 and 5, asked for by the defendants. They were as set forth in bill of exceptions No. 2, as set out in statement of the case. It will be seen that these instructions are in strict accord with the law as we have stated it above, and of course the court below did not err in refusing to grant a new trial, and in entering up the judgment it did for the defendants.

We have decided this case and written this opinion as if the respective rights of the public and the riparian owners on and in Stone Coal creek were governed solely by the commerce law. It is true, there are statutes of Virginia and of this State, which may or may not affect this question. If these statutes are applicable to this stream, they put the right of the public and the riparian owner on the same footing as if Stone Coal creek was a tidal river, and strictly and legally navigable. In regarding these statutes as inapplicable to Stone Coal creek we have taken the view most favorable to the plaintiff in error. The record is so imperfect, that we do not know whether the statutes have or have not any application to the Stone Coal creek. These statutes are thus referred to and stated by Minor in his Institutes, (volume 2, p. 20 :) "At common law the beds of rivers not navigable are always private, and belong to the neighbor riparian proprietors, each coming *ad filum fluminis;* or, if the same person own both banks, the whole bed belongs to him, subject, however, in both cases, to whatever use the public may be able to make of a stream for a public highway for boats or rafts. In Virginia the principle is only so far changed as that by statute the banks, shores, and beds of all streams are reserved which were granted by the state east of the Blue Ridge after 1780, and west of it after 1802." Whether this law would affect Stone Coal creek would depend on whether the riparian owners on that stream claim under patents prior or subsequent to 1802. What is the fact on this question the record does not disclose.

The judgment of the court below must be affirmed. Defendants in error must recover of the plaintiff in error their costs in this Court expended, and $30.00 damages.

AFFIRMED.