CAMPBELL BROWN & CO., INC., *a corporation,*

AND

PUBLIC LAND CORPORATION OF WEST VIRGINIA, *a public land corporation,*

v.

HOWARD T. ELKINS, *doing business as the* GUYAN RIVER COMPANY

(No. 10803)

Submitted April 18, 1956.     Decided June 12, 1956.

802

*Brown, Beckett & Burford, Douglas W. Brown, Jr., Robert H. Burford, John G. Fox,* Attorney General, *George G. Burnette, Jr.,* Assistant Attorney General, for appellants.

*Houston A. Smith,* for appellee.

*J. E. Litz, Herbert W. Bryan,* amici curiæ for United Fuel Gas Co.

RILEY, JUDGE:

Campbell Brown & Co., Inc., a corporation, and the Public Land Corporation of West Virginia, a public land corporation, filed their bill of complaint in the Circuit Court of Lincoln County against Howard T. Elkins, do-

ing business as Guyan River Company, praying for the issuance of an injunction restraining the defendant, Howard T. Elkins, from further dredging, excavating, removing and carrying away sand, gravel and coal from a portion of the bed of the Guyandotte River between the ordinary low water marks on each side of the river in Lincoln County, West Virginia, which portion of the Guyandotte River is included in a certain agreement, filed as an exhibit with Plantiffs' bill of complaint, dated February 3, 1955, entered into between the Public Land Corporation of West Virginia, and the plaintiff, Campbell Brown & Co., Inc., whereby the Public Land Corporation of West Virginia purports to lease to Campbell Brown & Co., Inc., the sole and exclusive right and privilege of dredging, excavating, removing and carrying away sand, gravel and coal from the portion of the bed of the river covered by the lease of February 3, 1955. To the bill of complaint the defendant, Howard T. Elkins, filed a demurrer and answer, which demurrer was overruled by the circuit court, and thereafter the plaintiffs filed a general replication to defendant's answer; and issue having been joined thereon the cause came on to be heard on October 24, 1955, upon the pleadings, at which time the defendant moved the court to dismiss plaintiffs' bill of complaint, which motion was overruled by the court. Thereupon the court proceeded to and did hear the evidence adduced on behalf of the plaintiffs, and at the conclusion thereof the defendant again moved the circuit court to dismiss plaintiffs' bill of complaint; and after hearing and considering the arguments of counsel on the motion to dismiss and the briefs filed by plaintiffs' and defendant's counsel, the court sustained the motion, ordered plaintiffs' bill of complaint dismissed, and thereby denied the relief prayed for in the bill of complaint.

Plaintiffs' bill of complaint alleges that the plaintiff, Public Land Corporation of West Virginia, is a public corporation created by Chapter 54, Acts of the Legislature, First Extraordinary Session, 1933, and that the

defendant, Howard T. Elkins, is an individual doing business as the Guyan River Company, and is a resident of Lincoln County, West Virginia; that the Guyandotte River is a navigable river lying wholly within the State of West Virginia; that pursuant to the authority granted to it by Chapter 54 of the aforesaid Acts of the Legislature, the Public Land Corporation of West Virginia, on February 3, 1955, in consideration of certain rentals and royalties, entered into a written lease with Campbell Brown & Co., Inc., a copy of which lease is made an exhibit with plaintiffs' bill of complaint and filed in evidence in support of the allegations of the bill of complaint, for a period of ten years from February 3, 1955, for "the sole and exclusive right and privilege of dredging, excavating, removing, and carrying away all of the usable and merchantable sand, gravel, and coal from that portion of the bed of the Guyandotte River, which lies between the ordinary low water mark on each side of the said river, situate in Lincoln County, West Virginia, and bounded and described as follows:

"COMMENCING at the mouth of Ranger Branch, approximately 1 1/2 miles below the Town of Ranger, Lincoln County, West Virginia, and extending 10 miles upstream (south) of the Guyandotte River to the vicinity of Atenville, Lincoln County, West Virginia,";

and that by letter dated February 3, 1955, the Public Land Corporation of West Virginia advised the defendant that it had executed a lease to Campbell Brown & Co., Inc., with the exclusive right to dredge and remove sand, gravel and coal from the bed of the Guyandotte River from the mouth of Ranger Branch in Lincoln County to a point ten miles south or upstream.

The bill of complaint alleges, and the evidence adduced in support thereof establishes that since February 3, 1955, and prior thereto the defendant has maintained and operated a dredging operation (hereinafter referred to as "defendant's second operation" or "the new plant") in and upon the Guyandotte River approximately one-third

of a mile south, upstream, from Ranger Branch, Lincoln County, and since February 3, 1955, the defendant, allegedly in total disregard of the rights of plaintiffs, has dredged, removed and carried away, and unless enjoined will continue to dredge, remove, and carry away, great quantities of coal from that portion of the bed of the Guyandotte River, which lies between the ordinary low water mark on each side of the river and extends from Ranger Branch ten miles upstream.

The bill of complaint further alleges that the aforesaid dredging operation of the defendant is situate on the Guyandotte River approximately one-third mile upstream, south, of the dredging operation of Campbell Brown & Co., Inc., and because the defendant has established his operation approximately three hundred feet above the mouth of Ranger Branch it thereby discharges sand, gravel and debris back into the river, which sand, gravel and debris float downstream and partially fill the sump maintained by Campbell Brown & Co., Inc., under its aforesaid lease with the Public Land Corporation of West Virginia, causing the former to lose great quantities of coal which it otherwise would have caught in its sump were it not for the alleged wrongful conduct of the defendant, and unless enjoined the defendant will continue to interfere with the operation of Campbell Brown & Co., Inc., under its lease.

Specifically, the Public Land Corporation of West Virginia alleges in the bill of complaint that the alleged wrongful act of the defendant in trespassing upon that part of the Guyandotte River lying between the low water marks and embraced in the alleged lease of February 3, 1955, and in removing coal therefrom has deprived, and will continue to deprive, the Public Land Corporation of West Virginia of revenue under the alleged lease by way of royalties, in that the defendant is taking coal and will continue to take coal from the leasehold of Campbell Brown & Co., Inc., without paying any rentals or royalties thereon to the Public Land Corporation of West Virginia, and that unless the alleged trespasses and wrong-

ful acts of the defendant are enjoined there will result a loss of revenue to the Public Land Corporation of West Virginia by way of royalties from Campbell Brown & Co., Inc., under the alleged agreement of February 3, 1955.

The bill of complaint contains a general allegation that the alleged continued trespasses and wrongful acts of the defendant will cause plaintiffs great and irreparable injury; that the trespasses and wrongful acts of the defendant are continuing in nature; and that the plaintiffs have no adequate remedy at law, in that in order to establish plaintiffs' rights at law would result in a multiplicity of suits for damages.

In addition to the plaintiffs' prayer that the defendant, Howard T. Elkins, be enjoined from the aforesaid trespasses and the alleged interference with the complete enjoyment of the leasehold granted to Campbell Brown & Co., Inc., by Public Land Corporation of West Virginia under the agreement of February 3, 1955, the plaintiff, Campbell Brown & Co., Inc., further prays that its damages resulting from the defendant's alleged wrongful acts and trespasses be ascertained and decreed against the defendant.

The demurrer of the defendant, Howard T. Elkins, to plaintiffs' bill of complaint specifies the following grounds: (1) That the allegation of the bill of complaint that " 'the Guyandotte River is a navigable river lying wholly in the State of West Virginia' " is a mere legal conclusion, which will not base the right to injunctive relief; (2) the bill of complaint fails to allege that the plaintiff, Public Land Corporation of West Virginia, is vested with the legal title to the stream bed, or other proprietary rights in the Guyandotte River, warranting, authorizing and permitting the Public Land Corporation to enter into the alleged lease with plaintiff, Campbell Brown & Co., Inc., for " 'the sole and exclusive right and privilege of dredging, excavating, removing and carrying away all the usable and merchantable sand,

gravel and coal from that portion of the bed of the Guyandotte River,' more particularly described in Paragraph II of said bill."; (3) that under the provisions of Chapter 54, Acts of the Legislature, First Extraordinary Session, 1933, the Public Land Corporation of West Virginia was created for governmental purposes only, and is not authorized or empowered to exercise the right of a proprietary nature in the stream beds of this State, or to contract for the granting or leasing of such stream beds; (4) the Commonwealth of Virginia in the issuance of large land grants prior to 1802, covering lands west of the Allegheny Mountains, now incorporated within the boundaries of the State of West Virginia, reserved only such stream beds as are necessary for governmental purposes, and such reservations did not include any title to any floatable sand, gravel and coal washing into such stream beds from the respective watersheds thereof; (5) the bill of complaint fails to allege facts wherein the defendant, a surface and riparian owner, has heretofore or is now illegally or without right dredging or removing sand, gravel or coal from the watershed thereof, and temporarily lodged at a particular location on the surface of the stream bed of the Guyandotte River; and (6) that the injunctive relief prayed for by plaintiffs would deprive defendant, Howard T. Elkins, of his property and property rights as a surface and riparian owner without due process of law.

The answer to the bill of complaint, while admitting that Paragraph I of the bill of complaint, which alleges the identities of the parties plaintiff and defendant, denies that the Guyandotte River is a navigable river, and that the plaintiff, Public Land Corporation of West Virginia, was authorized and empowered by the statute creating it to execute the alleged lease of February 3, 1955; and that in the latter regard the Commonwealth of Virginia by Letters Patent granted to one Samuel Smith, four certain contiguous grants, two of which contain 33,000 and 120,000 acres, dated June 29, 1797, and June 16, 1796, respectively, covering portions of what are now

the Counties of Cabell, Wayne, Putnam, Lincoln, Logan and Mingo, West Virginia; that the bed of the Guyandotte River is located approximately in the center of the Smith grants, and was not excepted or excluded therefrom; that the Guyandotte River intersects the 33,000-acre grant at Salt Rock, McComas District, Cabell County, extending across the same in a southeasterly direction into the 120,000-acre grant, passing through Lincoln County, and leaving Lincoln County at or near the mouth of Big Creek, Chapmanville District, (which district lies on the river at a place above and beyond the dredging operations in controversy), Logan County, West Virginia.

Defendant's answer further alleges that the defendant is advised and believes that the successors in title to the aforesaid Samuel Smith grants during the "1870's and 1880's" conveyed to divers and sundry persons all of the surface of the several Smith grants, including portions or all of the bed of the Guyandotte River intersecting and running through the Smith grants and particularly in what is now Lincoln County, West Virginia, in which surface conveyances the mineral and mineral estates were expressly excepted and reserved in favor of the grantors therein; and the answer further alleges that, defendant is further advised and believes, the surface of the grants, including the bed of the Guyandotte River, as aforesaid, is now owned and held by such Smith grantees; that by mesne conveyances, bearing date the 11th day of February, 1954, stemming through said Smith title as aforesaid, the defendant, Howard T. Elkins, acquired from one Russell Brunty the surface of a certain two-acre tract of land fronting 625 feet on the west side of and extending to the low water mark of the Guyandotte River, Laurel Hill District, Lincoln County, West Virginia, upon which surface tract of land the defendant heretofore constructed his dredging plant, located about one-third of a mile south or upstream from Ranger Branch, Laurel Hill District, Lincoln County, West Virginia.

810

The answer further alleges that the defendant is advised and believes that United Fuel Gas Company, a West Virginia corporation, which by leave of the circuit court, has filed a brief *amicus curiae*, is now the owner of the mineral and mineral estates within and underlying the alleged Smith grants, including portions or all of the bed of the Guyandotte River intersecting and running through the Smith grants, and in particular what is now Lincoln County, West Virginia.

The answer further alleges that defendant, under and by virtue of the aforesaid conveyances has constructed a dredging plant and has been and is legally operating the same for the purpose of catching sand, gravel and coal washing into the Guyandotte River above Campbell Brown & Co., Inc.'s dredging operation, which, by floating down with the current of the river, is being caught in defendant's catch basin or sump, which defendant alleges he is entitled to operate as a riparian surface owner by virtue of his aforesaid rights.

Defendant's answer also alleges that defendant owns a number of tracts of "surface real estate", situate on both the east and west sides of the Guyandotte River in Lincoln County, thus making him a riparian owner on both sides of the river covering more than one mile thereof, being located on the land which the plaintiff, Public Land Corporation of West Virginia, has undertaken to lease to the plaintiff, Campbell Brown & Co., Inc., and to one Hal Dial (another lessee) ; and that such tracts are now and were formerly operated prior to the acquisition of the Russell Brunty tract, which became necessary after the plaintiff, Campbell Brown & Co., Inc., located above the (original) operation of the defendant in an endeavor to destroy defendant's business of coal dredging and deprive him of taking coal from the river; and that all of such surface tracts are within the Samuel Smith grants.

The defendant further alleges in his answer that the Guyandotte River has heretofore been and now is by legis-

lative fiat and judicial determination considered a "float-able" stream, rather than a "navigable" stream. In this regard the defendant refers to Chapter CXXI, Acts of the Legislature, Regular Session, 1877, and to Code, 31-3, as amended; and, generally, to the several cases decided by this Court interpreting and determining the respective rights of boom companies, and thus using a stream, which has been "corked", for transportation and other purposes. Further this Court notes that the original Act contained in Chapter CXXI of the Acts of the Legislature, 1877, which is entitled: "AN ACT authorizing the formation of corporations for the purpose of constructing booms or dams for the purpose of stopping and securing boats, rafts, logs, masts, spars, etc., in certain counties of this state"; and that the counties specified in Section 1 of the Act do not include Lincoln, Logan, or Cabell County. However, Code, 31-3, a more general statutory enactment applicable to boom companies, provides in Section 1: "The consent of the State is given for the construction of a boom or booms, by corporations incorporated for the purpose, with or without piers, dam or dams, in the rivers, creeks or other streams of this State which may be neccessary for the purpose of stopping and securing boats, rafts, logs, masts, spars, lumber and other timber; Provided, however, that no such boom or dam shall be constructed in any of the rivers, creeks or other streams of the State, which are navigable by steamboats at an ordinary stage of water above the places where such boom or dam is proposed to be located."

On the basis of the foregoing statutes, authorizing and regulating boom companies, and the cases adjudicated by this Court in regard thereto, the defendant denies in his answer that the Guyandotte River is a navigable stream and calls on plaintiffs for strict proof thereof; and denies that the Public Land Corporation of West Virginia has any authority under the statute creating it to lease the stream for the excavating, removing and carrying away of sand, coal and gravel therefrom, as alleged in plaintiffs' bill of complaint. And defendant further

denies that the Public Land Corporation of West Virginia, is authorized to enter into the lease in question, as such lease is void and is in effect an attempt on the part of the Public Land Corporation of West Virginia to exercise a proprietary, rather than a governmental, interest or power; that the lease was beyond the contemplation of the Legislature in the enactment of the statute creating the Public Land Corporation of West Virginia; and that by leasing the bed of the river for the aforesaid purposes to Campbell Brown & Co., Inc., the Public Land Corporation has thereby attempted summarily to divest the defendant of his surface and riparian rights.

Defendant's answer admits as true the allegations of Paragraph III of the bill of complaint that defendant has maintained and operated a dredging operation in and upon the Guyandotte River approximately one-third of a mile south or upstream from Ranger Branch in Lincoln County, prior to and since February 3, 1955; but the defendant denies that since February 3, 1955, he has, in total disregard of the rights of plaintiffs, dredged, removed and carried away, and unless enjoined will continue to dredge, remove and carry away, great quantities of coal from that portion of the bed of the Guyandotte River between the ordinary low water mark on each side of the river and extending from Ranger Branch ten miles upstream.

In Paragraph IV of defendant's answer defendant denies the allegations contained in Paragraph IV of the bill of complaint; and in particular those which import that a second or new dredging operation was established on or about February 3, 1955, by the defendant at a point approximately three hundred feet above the mouth of Ranger Branch in Lincoln County, and the discharging by defendant of sand, gravel and debris back into the Guyandotte River, as a result of which the sump maintained by Campbell Brown & Co., Inc., loses great quantities of coal, which it would otherwise have retrieved in its sump, were it not for the alleged wrongful conduct of the defendant. The answer alleges that defendant for

a number of years maintained dredging operations in the Guyandotte River, which started in the month of August, 1946, at which time he removed sand only from the bed of the stream; that during the summer of 1947 defendant commenced to reclaim coal from the Guyandotte River, which coal came from the land of the riparian owners, on which defendant held exclusive ownership in himself or leasing rights; that for a number of years he was the sole and only operator on the Guyandotte River; that during the year 1952, Campbell Brown, the president of Campbell Brown & Co., Inc., came to defendant's plant, and informed him that he was intending to enter the dredging business at Branchland, which is some five miles downstream from defendant's original plant; that afterwards, during 1952, Campbell Brown & Co., Inc., entered into the dredging operations described in the bill of complaint, directly above defendant's original plant (which by scale on Defendant's Exhibit No. 2 appears to be one mile), and then and there commenced to take coal originally pumped and dredged by the defendant before the same could reach the plant of the defendant; that the operation of Campbell Brown & Co., Inc., was a short distance above the original dredging operation of the defendant; that it is true that thereafter, during 1952, the defendant, in order to protect his original investment, had to build a plant and dredging operation above that established by Campbell Brown & Co., Inc.; and that for this reason the defendant denies that his second or new operation deprives the plaintiff, Campbell Brown & Co., Inc., of any coal belonging to it.

The answer contains further allegations with reference to a dredging operation commenced in the year 1953 by Hal Dial, under a purported lease with the Public Land Corporation of West Virginia, (which allegations are not material to the issues here.)

In Paragraph V of defendant's answer, the defendant denies all allegations as to any wrongful acts or trespasses against the Public Land Corporation of West Vir-

ginia, as alleged in Paragraph V of the bill of complaint; and in Paragraph VI of the answer defendant denies all the allegations of Paragraph VI of the bill of complaint, and denies that the defendant will cause plaintiffs any great or irreparable injury by his activities on the Guyandotte River.

In Paragraph VII the defendant in detail alleges that during the year 1946 he entered into the business of dredging the bed of the Guyandotte River; that at that time and for a number of years no other person, firm or corporation was engaged in such business; that during 1947 he commenced to reclaim the coal which was in the bed and along the banks of the Guyandotte River, which apparently washed down from the coal fields of Logan County; that he obtained the services of mining engineers, and invested quite a sum of money in special equipment and machinery, so that he could process and market such coal; that he has obtained and now has a contract with the Premium Coal Company, a corporation in Cincinnati, Ohio, to take, and continue to take for five years from notice, all coal which he produces from his dredging operations; that the sand produced by him was shipped to the coal fields of Logan County to be used in and about the bank mining of coal; that prior to the time he entered into the taking of coal from the river he made inquiry of the State of West Virginia as to whether it had any claim to the coal, sand or gravel in the river, and that at that time the State, through its agents, expressly stated that it had no interest whatever to anything reclaimed or produced from the Guyandotte River, and that relying upon such representations defendant spent and now has large sums of money invested in his dredging, reclaiming, washing and other equipment, machinery and property in the sum of approximately two hundred thousand dollars; and that the defendant's gross business amounts to more than one hundred twenty thousand dollars annually.

The answer further alleges that until 1952 the de-

fendant had no competition; that not until Campbell Brown & Co., Inc., established its plant at the place designated in the lease above defendant's old plant was he compelled to establish the new plant upstream; that since 1946, when defendant first started to pump sand, and 1947, when defendant started to pump coal, he has always paid to the State any and all taxes for each and every year; and that he has always returned his personal property assessments in Lincoln County on his operations.

The answer further alleges that besides being a riparian owner at several other points on the Guyandotte River near or below where he is now carrying on his dredging operation, he owns a tract of land of approximately two acres on the west bank of the Guyandotte River, at a point above Campbell Brown & Co., Inc., where defendant is now carrying on his (second) dredging operation.

In the final paragraph of defendant's answer, designated Paragraph VIII, defendant alleges that he was first apprised that the Public Land Corporation was making any claim to the bed of the river or anything therein was on or about the _____day of _____, 195__, when he received a letter from the corporation's agent, asking him to make an application for a lease of the coal, gravel and sand which he intended to dredge from the bed of the stream, and stating that the corporation claimed the title thereto; that not admitting the State's ownership, but in order to avoid a suit such as the one at bar, or other false claims, the defendant applied in writing for a lease for two miles above the Town of West Hamlin in Lincoln County to Big Creek in Logan County, covering approximately thirty-five miles of the river; that the Public Land Corporation of West Virginia did not apparently at that time know that any other person, firm or corporation was dredging on the river; that defendant informed the agent of the Public Land Corporation of West Virginia of all persons, firms and corporations, including Campbell Brown & Co., Inc., and Hal Dial, who

were and still are operating on the Guyandotte River as defendant's competitors; that three weeks later defendant received a letter from the Public Land Corporation of West Virginia, advising him that it found that there was an overlapping of dredging operations between Campbell Brown & Co., Inc., Dial, and the defendant, and set a date for a meeting; that the defendant attended such meeting at the State Capitol in Charleston, which was attended by all other river dredging operators, and that at that time the merchantable coal parts of the Guyandotte River were tentatively divided by agreement with the Public Land Corporation of West Virginia's agent, the State Commissioner of Agriculture, J. B. McLaughlin, and all dredging operators, except Campbell Brown & Co., Inc., and the defendant; that later the defendant again called at the office of the Public Land Corporation of West Virginia, and verbally applied for a lease on one-third mile at the site of his second or present dredging operation; that the Public Land Corporation of West Virginia's agent called Campbell Brown & Co., Inc., and it was agreed that the Public Land Corporation of West Virginia would execute a lease to the defendant for the one-third mile site on Guyandotte River at defendant's second or present dredging operation, all terms and conditions being fully agreed upon; that later defendant was notified by letter that his original application for approximately thirty-five miles of the Guyandotte River for dredging purposes had been denied; that defendant relied upon the agreement between the Public Land Corporation of West Virginia, Campbell Brown & Co., Inc., and the defendant that he would receive a lease on the one-third mile of the Guyandotte River at the second or present site embraced in defendant's last verbal application; that defendant had no notice and received no knowledge that any lease had been made covering the dredging in Lincoln County until the lease had been fully executed and delivered to the lessees, so that defendant now avers that the plaintiffs, Public Land Corporation of West Virginia and Campbell Brown & Co., Inc., are seeking to deprive him of his lawful property without due

process of law, in that he was given no lawful hearing or any notice or knowledge of any meeting of the Public Land Corporation of West Virginia in letting leases covering that portion of the Guyandotte River on which he made application, or which he was fraudulently lead to believe he had been awarded a lease by the Public Land Corporation of West Virginia; and the defendant now avers that plaintiffs have entered into an illegal conspiracy to deprive defendant of his property without just or adequate compensation therefor and without due process of law.

Defendant's answer contains no prayer for general relief, but on the contrary prays that plaintiffs' bill of complaint be dismissed.

The circuit court having on June 22, 1955, overruled defendant's demurrer to plaintiffs' bill of complaint, the plaintiffs, Campbell Brown & Co., Inc., and Public Land Corporation of West Virginia, filed a general replication to defendant's answer, properly verified by the proper officers of Campbell Brown & Co., Inc., and Public Land Corporation of West Virginia.

The two all-embracing questions presented by the record are: (1) Whether the purported lease of February 3, 1955, is valid and within the powers of the Public Land Corporation of West Virginia and serves to vest in Campbell Brown & Co., Inc., for the period of ten years after the date thereof "the sole and exclusive right and privilege of dredging, excavating, removing and carrying away all of the usable and merchantable * * * coal from that portion of the bed of the Guyandotte River, which lies between the ordinary low-water mark on each side of said river", of the property embraced in the leasehold estate; and (2) whether the dredging operations of Howard T. Elkins, doing business as Guyan River Company, at his new or second plant are unlawful * * * and in contravention of the privileges which Campbell Brown & Co., Inc., have under the purported lease.

Plaintiffs' theory of the case, as disclosed by their bill

of complaint and the evidence in support thereof, including many and varied exhibits, embraces the following particulars: (1) That the Guyandotte River, at least at the places where Campbell Brown & Co., Inc., and the defendant, Howard T. Elkins, are operating their respective plants, is a navigable stream; (2) that the title to the bed of the Guyandotte River between the low water mark on each side of the river at those places in controversy in this case, under and by virtue of Chapter 54, Acts of the Legislature, First Extraordinary Session, 1933, is vested in the plaintiff, Public Land Corporation of West Virginia; (3) that the coal sought to be removed from the bed of the Guyandotte River by Campbell Brown & Co., Inc., within the limits of its purported leasehold is coal discarded by coal operations in Logan County along the Guyandotte River, and is fugitive coal or derelict coal, and no part of the realty, and, therefore, does not come within the provisions of Sections 3 and 4 of Article XIII of the West Virginia Constitution; and (4) that defendant's operations at his second or new plant are so conducted that Campbell Brown & Co., Inc., will be so irreparably injured that injunctive relief is warranted.

The theory upon which the defendant, Howard T. Elkins, doing business as Guyan River Company, bases his defense to plaintiffs' bill of complaint, and upon which the defendant based his motion in the circuit court that the bill of complaint be dismissed, which motion, after final hearing, was sustained by the court, is fully set forth in defendant's motion that the circuit court dismiss plaintiffs' bill of complaint and refuse the relief prayed for therein. Rather than attempt to summarize the grounds in support of that motion, it seems convenient to quote the motion *verbatim* :

> "Comes now the defendant, Howard T. Elkins, and moves the Court to dismiss plaintiffs' bill and assigns as grounds in support of said motion, the following:
>
> (1) That it is axiomatic that plaintiffs can-

not prevail for injunctive relief, unless they show some proprietary title in the Public Land Corporation of West Virginia in and to the bed and banks to, at least, the low water mark of Guyandotte river, authorizing and empowering said Land Corporation, as Lessor, to demise lease and let to Campbell Brown and Company, as Lessee, the bed and banks of the Guyandotte river, between the 'ordinary low water mark' for 'the sole and exclusive right and privilege of dredging, excavating, removing and carrying away all the usable and merchantable sand, gravel and coal,' for proprietary purposes. This they have failed to do for the following reasons:

(a) The Commonwealth of Virginia disposed of its proprietary rights in the stream bed of the Guyandotte river by the issuance of numerous senior land grants prior to January 15, 1802, among others a 33,000 and 120,000 acre grants to one Samuel Smith, dated June 29, 1797, and June 16, 1796, respectively, which covers that portion of the river bed of Guyandotte herein involved. (Acts of Virginia 1776-1802, page 423)

(b) If the Guyandotte river be held a 'navigable stream,' navigable in fact for 'boats and lighter' for commercial purposes the Commonwealth of Virginia reserved to itself only 'an easement in the public, which it held in trust by the State for the promotion of commerce and the regulation and protection of navigation for the general public on such navigable waters. (Barre v. Fleming, 29 W. Va. 314, 1 S. E. 731)

(2) The plaintiffs' evidence, weighted in the most favorable light, show the Guyandotte river to be only a 'floatable' stream — the only evidence of 'steam-boating' thereon being that of a unique type of flat boat, rigged with a steam boiler, and never used on said stream other than isolated occasions under abnormally high water conditions, there being no evidence that there was established steamboating 'dur-

ing such period of year as to make Guyandotte river valuable to the public as a public way.'

(3) Under the provisions of Chapter 54, Acts of the Legislature, First Extraordinary Session 1933 (Ch. 37, Art. 2A W. Va. Code, 1931, as amended) the Public Land Corporation of West Virginia was created for governmental purposes only and has no proprietary powers. (Sims v. Fisher, 125 W. Va. 512, 25 S. E. (2d) 216).

(4) That lands owned by the State of West Virginia must be disposed of under Sections 3 and 4, Article XIII of the Constitution.

(5) That if it be assumed that the State of West Virginia owns the bed of the Guyandotte river and the coal, sand and gravel floating down same, a lease thereof, by the Public Land Corporation is void and will not sustain a suit for injunctive relief, based thereon. (State v. Davis (W. Va.) 83 S. E. (2d) 114.)

(6) That as a riparian owner, the defendant, Howard T. Elkins, has the right to remove drift-wood, sand, gravel and coal from the Guyandotte river and the plaintiffs have no title thereto so as to warrant the Courts' issuance of an injunction to prevent the removal thereof."

The threshold question presented by this record is: Does the Public Land Corporation of West Virginia have authority under the provisions of Sections 1 to 10, inclusive, of Chapter 54, Acts of the Legislature, First Extraordinary Session, 1933, and in particular Sections 4 and 8 thereof, to execute leases or enter into contracts with private individuals for the extraction of minerals from the beds of navigable streams within this State?

Section 4 provides: "The corporation shall likewise have the authority to acquire by purchase, condemnation, lease or agreement, or exchange and to receive by gifts or devise lands, rights of way or easements, waters and minerals suitable for any public purpose." Section 8 pro-

vides: "The corporation shall have the authority to designate lands to which it has title for development and administration for the public use including forestation, stock grazing, agricultural rehabilitation and homesteading and may contract or lease for the proper development of oil, gas, mineral and water rights within or upon the lands or property under its control. It shall convey, assign, or allot lands to the title or custody of proper departments or other agencies of state government for administration and control within the functions of such departments or other agencies as provided by law. The corporation shall make proper lands available for the purpose of cooperating with the government of the United States in the relief of unemployment and hardship."

The provisions of the statute exhibit a legislative intent that the Public Land Corporation of West Virginia be empowered to develop and exploit the public lands within the boundaries of the State of West Virginia for the public interest. The broad scope of the provisions of the statute evidences a legislative intent that the statute has underlying it a strong public policy that public lands be used so as to best inure to the interest of the people of this State; and in particular is this public policy shown by the provisions of Section 8 of the statute, creating the Public Land Corporation of West Virginia, which reads: "The corporation shall have the authority to designate lands to which it has title for development and administration for the public use including forestation, stock grazing, agricultural rehabilitation and homesteading and *may contract or lease for the proper development of oil, gas, mineral and water rights within or upon the lands or property under its control."* (Italics supplied.)

At the hearing the allegations of the bill of complaint and the answer as to the respective locations of the old and new plants of the defendant, Howard T. Elkins, and the plant of the lessee, Campbell Brown & Co., Inc., on the Guyandotte River were fully proved by the evidence. The

evidence clearly establishes that the defendant, Howard T. Elkins, began his first operation in 1946, consisting solely of the pumping of sand; that in 1947 he commenced the pumping of derelict coal from the bed of the river at the place where his original plant was located; that the plaintiff, Campbell Brown & Co., Inc., began its operation early in 1952 at the point on the Guyandotte River about a mile above Elkins' original plant, and thereafter continued the operation under the agreement of February 3, 1955. Thereafter, as alleged in the bill of complaint and admitted in the answer, Elkins established his new or second plant about one-third of a mile above the place where the plant of Campbell Brown & Co., Inc., was located.

At this point attention should be directed to the agreement between Public Land Corporation of West Virginia and Campbell Brown & Co., Inc., dated February 3, 1955. This agreement does not purport to convey to Campbell Brown & Co., Inc., the sand, gravel and coal in the bed of the Guyandotte River between the low water marks thereof at the site designated in the agreement for the operation of Campbell Brown & Co., Inc. It does not, in our opinion, convey an estate in the materials extracted from the river embraced in the agreement, but it is a mere license issued by the Public Land Corporation of West Virginia to its co-plaintiff to extract sand, gravel and coal. The coal being extracted from the bed of the Guyandotte River by Campbell Brown & Co., Inc., is not virgin coal. It is coal discarded from the coal fields of Logan County and carried downstream with the current of the Guyandotte River. It is derelict property to which no one except the Public Land Corporation holds title. It is "Personal property abandoned or thrown away by the owner in such manner as to indicate that he intends to make no further claim thereto. 2 Blackstone's Commentaries 9; 2 Reeves Eng. Law 9; *Thompson* v. *One Anchor and Two Anchor Chains,* D. C., Wis., 221 F. 770, 772." Black's Law Dict. 4th ed. 529. And as this record discloses that the lessee, Campbell Brown & Co., Inc., is

not taking sand from the bed of the river, and the material extracted therefrom by that corporation is derelict coal, the title thereto belongs to the State of West Virginia, whether the Guyandotte River is navigable or whether title to the bed of the stream between the two low water marks resides in the Public Land Corporation of West Virginia. Clearly, it comes within the provision of Code, 34-2-1, which provides for the ownership of unclaimed or residuum and derelict property and the method of recovery in the following language: "The residuum of a decedent's estate, belonging to the State, and any property derelict, or having no rightful owner, may be recovered from any person in possession thereof, by a bill in equity in the name of the State."

As this State neither borders on nor contains large lakes, and is an inland state, not bordering on any ocean, the word "derelict" employed in the West Virginia statute is not used as it is in the decisions involving maritime law.

Notwithstanding, however, that Campbell Brown & Co., Inc., is taking from the Guyandotte River, under the agreement of February 3, 1955, only coal, which has no ownership, it is necessary for us in this case to construe the agreement of February 3, 1955, which purports to give to Campbell Brown & Co., Inc., the exclusive right to extract from the bed of the Guyandotte River at the point embraced in the agreement sand, gravel and coal. These materials, in our opinion, are minerals. It has been held that the ordinary meaning of " 'mineral' in a deed includes every substance which can be got beneath the surface." *Stowers* v. *Huntington Development & Gas Co.*, (C.C.A. W. Va.), 72 F. 2d 969, 972, 98 A. L. R. 536; 4 Caldwell's Judicial Dict.-Digest, pages 2828 and 2829. Also it has been held that sand, stone, and, consequently, gravel are minerals. 27 Words & Phrases, Perm. Ed. 212, 213, 219. Therefore, if the Guyandotte River at the place embraced in the agreement of February 3, 1955, is a navigable stream, and the ownership of the bed thereof between the low water marks of the

stream resides in the State, the title thereto belongs to the Public Land Corporation of West Virginia in trust for all the people of the State, and the Public Land Corporation of West Virginia has the express authority, under the Act of the Legislature creating it, to license for its development in the public interest.

Specifically, Section 2, Chapter 54, Acts of the Legislature, First Extraordinary Session, 1933, provides: "The corporation shall be vested with the title of the state in public lands, the title to which now is or may hereafter become absolutely vested in the State of West Virginia by reason of any law governing the title of lands within the state." The instant case, in our opinion, does not come within the inhibitory and salutary provisions of Article XIII of the Constitution of West Virginia, Section 3 of which deals with forfeited lands, and Section 4 of which embraces waste and unappropriated lands. Clearly, the provisions of Article XIII of the West Virginia Constitution were submitted to the electorate of this State in the Constitution of 1872 for the purpose of settling land titles in the State, and providing for the settling of all titles to land in this State, which, prior to the adoption of the West Virginia Constitution, were forfeited or treated as waste and unappropriated lands, or escheated to the Commonwealth of Virginia or to the State of West Virginia, or purchased by either the Commonwealth of Virginia or the State of West Virginia at sales made for the nonpayment of taxes; and as such *State ex rel. Mahaffey* v. *Batson,* 128 W. Va. 55, 63, 36 S. E. 2d 497, 502, which states: "When the Constitution was framed, adopted, and ratified, it was certainly the policy of the State to encourage people to take advantage of the provisions of this section [Section 3, Article XIII, of the Constitution], in order to settle land titles, and to place the properties in the hands of those who would develop them and pay taxes", is not applicable to the case at bar. If the policy of the Commonwealth of Virginia and this State is to keep control of its streams, and especially those which are navigable, the land invol-

ved here, namely, the bed of the Guyandotte River, between the low water marks, if it is public lands, is vested, under Section 2, Chapter 54, Acts of the Legislature, First Extraordinary Session, 1933, in the Public Land Corporation of West Virginia; and it is neither forfeited land within the meaning of Section 3, Article XIII of the West Virginia Constitution, nor is it waste or unappropriated lands within Section 4 of Article XIII of the Constitution. Therefore, the cases of *Sims, Auditor* v. *Fisher, Judge,* 125 W. Va. 512, 25 S. E. 2d 216, and *State* v. *Davis,* 140 W. Va. 153, 83 S. E. 2d 114, which cases dealt with the sale of forfeited lands, have no application to the instant case.

This holding brings us to the determination of the mixed, factual and legal questions: (1) Was the Guyandotte River navigable, in fact, at the time of determining title thereto; and (2) does the State of West Virginia hold the title to the bed of the Guyandotte River between the low water marks of the river?

The test of the navigability of a non-tidal stream has been developed and enlarged in the decisions of the Supreme Court of the United States, as well as in the decisions of this Court. In 1871 the Supreme Court of the United States in *The Daniel Ball* v. *United States,* 10 Wall. 557, 77 U. S. 557, 19 L. ed. 999, established the narrow rule that: "* * * Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, *in their ordinary condition,* as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. * * *" (Italics supplied). But later in 1874, the Supreme Court of the United States in *United States* v. *Montello,* 20 Wall. 430, 87 U. S. 430, 22 L. ed. 391, broadened the basic concept of navigability adopted in *The Daniel Ball* case, stating: "It would be a narrow rule to hold that in this country, unless a river was capable of being navigated by steam or sail vessels,

it could not be treated as a public highway. The capability of use by the public for purposes of transportation and commerce affords the true criterion of the navigability of a river, rather than the extent and manner of that use. If it be capable in its natural state of being used for purposes of commerce, no matter in what mode the commerce may be conducted, it is navigable in fact, and becomes in law a public river or highway. Vessels of any kind that can float upon the water, whether propelled by animal power, by the wind, or by the agency of steam, are, or may become, the mode by which a vast commerce can be conducted, and it would be a mischievous rule that would exclude either in determining the navigability of a river. * * *" And only recently in 1940 the Supreme Court of the United States in *United States* v. *Appalachian Electric Power Co.*, 311 U. S. 377, 61 S. Ct. 291, 85 L. ed. 243, a case involving the navigability of the New River, a water course flowing through Virginia and West Virginia, broadened the criteria of navigation for determining the conclusion as to whether a waterway is a navigable river of the United States. The holding of the Court is particularized and succinctly stated in the following points of the headnotes of the *Appalachian Electric Power Company* case:

"2. The ultimate conclusion as to whether a particular waterway is a navigable water of the United States, and the judicial standards to be applied in making the determination, involve questions of law inseparable from the particular facts to which they are applied.

"3. A waterway which by reasonable improvement can be made available for navigation in interstate commerce is a navigable water of the United States, provided there be a balance between cost and need at a time when the improvement would be useful.

"4. In such case, it is not necessary that the improvement shall have been already undertaken or completed nor even that it shall have been authorized.

"5. A navigable water of the United States does not lose that character because its use for navigation in interstate commerce has lessened or ceased.

"6. A waterway may be a navigable water of the United States for a part only of its course.

"7. Lack of commercial traffic does not preclude the classification of a waterway as a navigable water of the United States where personal or private use by boats demonstrates its availability for the simpler types of commercial navigation."

Of course, in the *Appalachian Electric Power Company* case the Supreme Court of the United States applied the commerce clause of the Constitution of the United States, and, in that particular, that case is different from the one at bar. In point 10 of the headnotes the Supreme Court held: "The authority of Congress over navigable waters of the United States is not limited to control for the purposes of navigation only, but is as broad as the needs of commerce."

However, in *Gaston* v. *Mace,* 33 W. Va. 14, 10 S. E. 60, this Court, applying the test of navigability employed in *The Daniel Ball and Montello* cases, defined the principles governing the navigability of waterways of this State in the following language:

"* * * In the United States there are three classes of navigable streams: (1) Tidal streams, that are held navigable in law, whether navigable in fact or not; (2) those that, although non-tidal, are yet navigable in fact for 'boats or lighters,' and susceptible of valuable use for commercial purposes; (3) those streams which, though not navigable for boats or lighters, are floatable, or capable of valuable use in bearing logs or the products of mines, forests and tillage of the country they traverse to mills or markets.

* * *

"With reference to the second of these classes of navigable streams it will be observed

from its definition, that, whether fresh water streams be or be not navigable, is a question of fact, and as such those, who claim such non-tidal streams to be navigable, have on them the burden of proving that such streams are in fact navigable for boats or lighters and susceptible of valuable use for commercial purposes in their natural state, unaided by artificial means or devices. The stream, too, to belong to this second class of navigable streams, must be thus capable of being navigable, not all the time, for such length of time during the year as will make such stream valuable to the public as a public highway. But the fact, that the stream can not be so used at certain seasons of the year, will not destroy the public right of navigation or make such streams non-navigable. See *McManus* v. *Carmichael*, 3 Iowa 1; *Rhodes* v. *Otis*, 33 Ala. 578; *Morgan* v. *King*, 35 N. Y. [454] 459; *Berry* v. *Carle*, 3 Greenl. 269; *Wadsworth* v. *Smith*, 11 Me. 276; *People* v. *Tibbetts*, 19 N. Y. 523; *Reynolds* v. *McArthur*, 2 Pet. 417; Woods, Nuis. Sec. 587."

In the *Town of Ravenswood* v. *Fleming*, 22 W. Va. 52, a case involving the navigability of the Ohio River, and the rights of riparian owners thereon, this Court at page 65 of the opinion said: "An examination of all the statutes of Virginia will show, that the State has always asserted the right in its exercise of sovereignty to control the bed, shores and banks of all the navigable waters within the commonwealth. 10 Hen. St., ch. 2 p. 226; 1 Rev. Code, ch. 86 p. 323; Code of 1849, ch. 62 p. 326; Code of 1860, ch. 62 p. 366."

In the *Ravenswood* case, this Court quoted Article 1, Section 1, of the first Constitution of West Virginia: "The State of West Virginia shall also include so much of the bed, banks and shores of the Ohio river as was heretofore apportioned to the State of Virginia; and the territorial rights and property in and the jurisdiction of whatever nature over the said beds, banks and shores heretofore reserved by or vested in the State of Virginia shall vest in and be he*er*after exercised by the State of

West Virginia"; and the provisions of the Constitution of West Virginia of 1872, contain the same language, but include the Big Sandy River and add: "And such parts of the said beds, banks and shores as lie opposite, and adjoining the several counties of this State, shall form parts of said several counties respectively."

These constitutional provisions, though they do not involve the navigability of the Guyandotte River, bear pertinently on this case, as they evidence the intent of the electorate of this State in adopting the two Constitutions that the State of West Virginia would have control of the streams lying within the boundaries of the State.

Moreover, by legislative fiat the Guyandotte River has been determined to be a navigable stream. In Chapter XLVI, Acts of the Legislature, Regular Session, 1887, entitled: "AN ACT to provide for the removal of mill-dams, and all other dams, * * * in the Guyandotte river below the Wyoming county line.", it was enacted in Section 1: "That all mill-dams and other dams in Elk river, of this State, between the mouth of said river and the Webster county line, and in the Guyandotte river below the Wyoming county line, which obstruct, impede, or interfere with navigation or floatage of boats or lumber, shall be deemed public nuisances, whether established under order of any court or act of the Legislature, and the owners or occupiers of them may be jointly or separately indicted for maintaining the same, and on conviction, besides judgment of fine or imprisonment, or both, which the court may inflict, judgment shall be rendered that such dam be abated, and the court shall cause such judgment of abatement to be executed."

By Chapter CXXI, Acts of the Legislature, Regular Session, 1877, the Legislature enacted into legislation: "AN ACT authorizing the formation of corporations for the purpose of constructing booms or dams for the purpose of stopping and securing boats, rafts, logs, masts, spars, etc., in certain counties of this state", which Act did not embrace any of the counties through which the

Guyandotte River flows, but Chapter CXXI is pertinent to this case as a further indication that the State of West Virginia, like its sister state, the Commonwealth of Virginia, always regarded that it had control of the navigable and non-navigable streams within its boundaries.

And on March 16, 1849, the General Assembly of the Commonwealth of Virginia passed an Act incorporating the "Guyandotte Navigation Company", which provided for a corporation for improving the navigation of the Guyandotte River by slackwater from its mouth in the County of Cabell to Logan Courthouse, and as far above that point as may be deemed practicable, either by slackwater navigation, or any other mode of improvement. Thus by legislative fiat the Commonwealth of Virginia recognized the Guyandotte River as being a navigable stream.

The Act of the General Assembly of the Commonwealth of Virginia, incorporating the "Guyandotte Navigation Company", was prompted by a survey of the Guyandotte River from its mouth at the Ohio River to Logan Courthouse, made in 1848 at the instance of the Board of Public Works of Virginia, filed in the State Library of the Commonwealth of Virginia, at Richmond, Virginia, as shown by the report of one Joseph Gill, which survey was conducted between September 1 and November 1, 1848, when the Guyandotte River was at a low stage. In this report the surveyor or reporter, Joseph Gill, suggested that navigation be improved on the Guyandotte River by the installation of a system of locks and dams extending from the mouth thereof to Logan Courthouse; and in the second paragraph of the report, in evidence in this case, Gill stated: "In reference to the general features and character of the river and its banks, from Guyandotte up to Logan courthouse, the stream varies in width from 40 to 80 and 100 yards, but would probably average about 60 yards. The depths at the low stage of water when these observations were made, upon the shoals, rapids and gentle falls, was from six inches to two feet, and upon the still water ponds, between the shoals, from

two feet up to 16 feet deep and upwards. By much the greater portion of the length of the river is occupied by these still water ponds, extending from a quarter of a mile up to two miles and upwards in length, with generally short intervening shoals of loose rock or gravel forming the elevation of the stream. Most of these ponds are of sufficient depth to float craft drawing four feet or upwards of water."

On November 21, 1788, the Assembly of Virginia passed an Act, contained in Chap. XXI, 12 Hening's Statutes at Large 679, entitled: "An act giving further time to the owners of entries on the western waters to survey the same."

In October, 1785, the Assembly of Virginia passed an Act, contained in Chapter XLI, 12 Hening's Statutes at large, page 99, entitled: "An act to repeal an act *intituled* an act concerning entries and surveys on the western waters and for other purposes."

That historically the Commonwealth of Virginia has exercised and controlled its streams goes back to Colonial days. In March, 1761, the Lieutenant-Governour, Council and Burgesses, constituting the General Assembly of the Colony of Virginia passed an Act, 1st George III, directing that one Allan Howard remove a dam and millhouse, which the Act recites obstructed the Rock Fish River, and prohibited generally the erection of any mill or the raising of any dam, hedge or stops in Rock Fish River below a certain point designated in the Act. 7 Hening's Statutes at Large 423.

In addition, according to a report of the Secretary of War, being a part of a message and documents communicated to the Congress of the United States in 1875, in evidence in this case, the Guyandotte River at one time was improved at the expense of the Commonwealth of Virginia by the construction of six locks and dams, five of which had been washed away (four wholly and one partly) at the time of the report of the United States Engineers Office at Cincinnati, Ohio, dated January 12,

1875, and the sixth was reported to be the greatest obstruction found in the river. This report of the United States Engineers Office of 1875 embraces an estimate of the cost of seventeen locks on the Guyandotte River, of varying lifts, resulting in an estimated uniform lift of about ten feet. Attached to the report of the Secretary of War in 1875, likewise in evidence in this case, is the report of A. L. Cox, then Assistant United States Engineer, which *inter alia* states:

> "The distance from Logan Court-House to the mouth of the Guyandotte River is 81 1/2 miles. The total fall of the river in this distance is 147.76 feet. I have taken great pains to ascertain the minimum volume of water discharged by this river. From September 20 to November 12 of this year there was but a slight rain-fall in this portion of the State. A cross-section of the river on the 16th of October gave a flow of 110.8 cubic feet per second. Another computation, based upon observations of the river November 12, 1874, gave a flow of 30 cubic feet per second.

> "I think we may safely conclude that the discharge of this river will never fall below 20 cubic feet per second, while for the most part of the three dry months the river will yield a volume of 40 feet per second, and probably for nine months of the year the supply will reach from 120 to 170 feet per second."

At this point it may be well to mention that the action of the United States Engineers, a branch of the War Department of the United States Government, in exercising jurisdiction over a stream is not conclusive that the stream is navigable, but such exercise of jurisdiction should be considered and has weight on the question of the navigability of the stream. *Harrison* v. *Fite*, 148 F. 781, 78 C. C. A. (Ark.) 447; *U. S.* v. *Appalachian Electric Power Co.*, 23 F. Supp. 83, affirmed C. C. A. 107 F. 2d 769, reversed 311 U. S. 377, 61 S. Ct. 291, 85 L. ed. 243, rehearing denied 317 U. S. 594 (reversed on another point.) See also Am Jur., Waters, Sections 193-200.

This record establishes beyond peradventure that before the advent of the railroad through Logan and Lincoln Counties, West Virginia, in 1904, except for a tortuous dirt road from Logan to Brownstown (now Marmet), in Kanawha County, the Guyandotte River was the only mode of transportation to and from Logan, West Virginia. Likewise the evidence in this record establishes that between 1820 and 1823, mercantile establishments were opened on what was then known as the "Islands of the Guyandotte", the present site of Logan, West Virginia; that produce was shipped down the Guyandotte River; thence up the Ohio River to Pittsburgh, Pennsylvania; thence overland to Philadelphia; and was shipped back the same route in canoes, which were from twenty-eight to thirty feet long, and carried approximately three thousand pounds of goods; that prior to the War between the States furs and ginseng were transported down the Guyandotte River, variously described, by aged witnesses who operated, and saw operated, push boats, as being from eight to twelve feet wide and from fifty to eighty feet in length, and carrying freight weighing from ten to eighteen thousand pounds, which push boats were operated by hand, and prior to the advent of the railroad were operated by small steamboats which plied between Guyandotte and a point a short distance above Logan; that during high stages of the waters of the Guyandotte River these steamboats and push boats were operated twelve months a year; and that during the dry season, according to one witness, ten months a year.

Bearing most pertinently on the question whether prior to the advent of the railroad and the subsequent overgrowth of timber along the river and the placing in the river of sediment coal from coal operations in Logan County, the Guyandotte River was navigable, is the testimony of one Urias B. Buskirk, now deceased, an early merchant in Logan, West Virginia, who was ninety-two years of age at the time he testified, who, in the futherance of his mercantile business, operated a fleet of push boats on the Guyandotte River, and who testified that

boats could be operated eleven months of the year on an average, and that was the only method by which he could obtain supplies, except by the use of a team of horses over the dirt road from what is now Marmet to Logan, West Virginia. The testimony of this witness stands uncontradicted in this record.

Likewise uncontradicted is the testimony of the witness Bernie Messenger, seventy-three years of age, who has lived on the Guyandotte River all his life, and starting in 1896 or 1897 had worked for an employer who operated push boats seventy or eighty feet long, eight and one-half to nine feet wide, and carried ten to fifteen thousand pounds; and who testified that he worked every day and Sunday the year around, as his employer's boats were operated all the time. This witness testified that there were no roads into Logan; that two steamboats, the J. P. Hustler and the Guyandotte, shoved the push boats as far as possible up to Logan, when there was sufficient water, and that when the water was down the Hustler was used to take the push boats to Four Mile Shoals at Branchland, and then turned back toward Guyandotte. This witness testified that there were twenty-three shoals in the river between Guyandotte and Logan, and that in those days the river contained more water than it does at the present time, and is now narrower because of fallen trees and brush.

To the same effect is the testimony of the witness, William Guy Peck, born in 1877, who lived at Pecks Mill, Logan County, West Virginia, seven miles from Logan, from the time of his birth until 1891; and the testimony of Theodore B. Hatfield, age seventy-nine, who lives at Ranger, two or three hundred feet from the Elkins operation and downstream therefrom. It is established beyond peradventure that four steamboats operated on the Guyandotte River, namely, the Guyandotte, J. P. Hustler, Favorite and Kessler, which steamboats handled merchandise and groceries and brought commodities to the riparian settlers along the river. The witness, Theodore

B. Hatfield, also saw a steamboat, the "Favorite" on the river, which he testified was "a Big Sandy River boat." These steamboats, this witness testified, came up the Guyandotte River as far as Pecks Mill, where there was a sluice on the side of the dam which permitted traffic to go through on the river.

True, this record discloses that during dry and normal periods, because of the many shoals in the Guyandotte River between Logan and its mouth, it became necessary at times to pull the push boats and steamboats through the shoals by means of windlasses or pulleys. However, as to a stream which is navigable because it is valuable to the public as a public highway, the fact that it cannot be used at certain seasons of the year will not destroy the right of navigation or make such stream non-navigable. *Gaston* v. *Mace,* supra. And a stream navigable in the sense that it is or may be used by the public for transportation and commerce is not rendered non-navigable because of the difficulties attending such navigation. The holding of the Supreme Court of the United States in the *Montello* case is set forth in headnote 2 thereof, which reads: "These doctrines applied to the Fox River, in Wisconsin, a river whose navigability was originally so much embarrassed by rocks, rapids, &c., as that only Durham boats could use the stream, but which afterwards, by canals, locks, and other artificial means was so much improved as that steamboats could use it freely; the river having, however, never, in its natural state, been a channel for useful commerce." In *United States* v. *Holt State Bank,* 270 U. S. 49, 46 S. Ct. 197, 70 L. ed. 465, a case which held that the lands underlying navigable rivers within the state belong to the state in its sovereign capacity and may be used and disposed of as it may elect, subject to the paramount power of Congress to control such waters for the purpose of navigation in interstate and foreign commerce, it was held in headnote 5 that the navigability of a stream sought to be established as navigable in law and in fact is not dependent "on the absence of occasional difficulties in navigation,

but whether the stream, in its natural and ordinary condition, affords a channel for useful commerce." See generally *United States* v. *Utah*, 283 U. S. 64, 51 S. Ct. 438, 75 L. ed. 844; *Economy Light & Power Co.* v. *United States*, 256 U. S. 113, 41 S. Ct. 409, 65 L. ed. 847.

It would be useless further to proceed with a delineation of the evidence of the navagability of the Guyandotte River. Suffice to say that in days gone by, and before the advent of the railroad through Lincoln and Logan Counties, the Guyandotte River was by legislative fiat, in fact, a navigable stream, and a means of commerce and transportation; and a stream once having been navigable, in fact, is navigable in law and always remains so. *United States* v. *Appalachian Electric Power Co., supra; Economy Light & Power Co.* v. *United States*, 256 U. S. 113, 41 S. Ct. 409, 65 L. ed. 847. For the purpose of determining the ownership of the beds of streams such navagability, both in law and in fact, is to be determined as to the formation of the Union of the original states, or the admission to statehood of those later formed. *State* v. *Longyear Holding Co.*, (Minn.), 29 N. W. 2d 657. Thus the bed of the Guyandotte River, as well as other navigable streams within the boundaries of West Virginia, between the low water marks thereof belongs to the State of West Virginia. *Town of Ravenswood* v. *Fleming*, 22 W. Va. 52. This axiom is true unless the Samuel Smith grants contained in the Letters Patent, dated June 29, 1797, and June 13, 1796, respectively, covering, as alleged in the answer, portions of the counties of Cabell, Wayne, Putnam, Logan and Mingo, serve to vest in the defendant by mesne conveyances, as alleged in the answer, as a riparian owner, title to the bed of the Guyandotte River where the defendant is such owner.

After a careful consideration we are of opinion that the defendant is not entitled to prevail on the ground of the allegation as to the Samuel Smith grants contained in the defendant's answer. Chapter 7 of the Acts of the Assembly of Virginia, passed on January 15, 1802, con-

tained in 2 Shepherd's Statutes at Large, N. S. and Chapter CCXC, Acts of Virginia, 1802, provides:

"1. Where it hath been represented to this present general assembly that many persons have located, and lay claim in consequence of such location to the banks, shores, and beds of the rivers and creeks in the western parts of this commonwealth, which were intended and ought to remain as a common to all the good people thereof;

"2. *Be it therefore enacted*, That no grant issued by the register of the land office for the same, either in consequence of any survey already made, or which may hereafter be made, shall be valid or effectual in law to pass any estate or interest therein.

"3. This act shall commence and be in force from and after the passing thereof."

In the case of *Norfolk City* v. *Cooke*, 27 Gratt. 430, pt. 2 syl., cited by Mr. Justice Gray in *Shively* v. *Bowlby*, 152 U. S. 1, 14 S. Ct. 548, 38 L. ed. 331, the Virginia Court of Appeals held that: "A patent for land constituting a part of the bed of a navigable river, conveys no title to it."

For still another reason based upon the state of the pleadings in this case, the defendant is not entitled to prevail on the basis of the allegation concerning the Samuel Smith grants contained in defendant's answer. The answer alleges the existence of the Samuel Smith grants, and it contains only general allegations as to the mesne conveyances under which defendant claims, and prays simply that plaintiffs' bill of complaint be dismissed. True, the allegations of the answer as to the Samuel Smith grants and the mesne conveyances are of an affirmative nature, but these affirmative allegations are set forth only in defense of plaintiffs' bill of complaint. As the defendant by his answer is seeking no affirmative relief, it was unnecessary under Code, 56-4-58, for the plaintiffs to file a special reply to the answer,

but having filed a general replication the burden then rests upon the defendant to establish by proof the affirmative allegations of his answer, and not having done so, as disclosed by this record, the affirmative defensive allegations of the answer cannot be considered at this late day in the progress of this suit. Embedded and well grounded in the equity practice and procedure of this State is the rule that where the affirmative allegations of an answer, which are directed only in defense of the allegations of a bill of complaint, are met by a general replication, and no proof is adduced in support of such affirmative defensive allegations, the defendant is precluded from asserting a defense on the basis of such affirmative defensive allegations. In point 3 of *Fulmer Coal Co.* v. *Morgantown & Kingwood Railway Co.*, 57 W. Va. 470, 50 S. E. 606, this Court held: "Where an answer is filed praying for affirmative relief, and, in addition to denying the allegations of the bill, sets up only such new matter as could be set up in defense to plaintiff's bill, no special reply under section 35, chapter 125, Code, is required, *but a general replication* puts defendant upon proof of such new matter." (Italics supplied). See generally *Hunt* v. *DiBacco*, 69 W. Va. 449, 71 S. E. 584, pt. 3 syl., a case involving an action at law.

So we simply hold that under the state of the pleadings the defendant has had his day in court, and cannot prevail under the allegations of his answer as to the Samuel Smith patents.

Likewise we hold that the plaintiffs, though in their bill of complaint they ask for an accounting as to the coal allegedly wrongfully taken by the defendant, have had their day in court.

Counsel for the United Fuel Gas Company, a corporation, has filed in this Court, with its permission, a brief as *amicus curiae*. Though this brief has been very helpful to the Court in considering the matters in issue, it is to be noted that as the United Fuel Gas Company was not a party, either plaintiff or defendant, to the suit in

Lincoln County, West Virginia, our instant decision does not affect the rights, if any, which the United Fuel Gas Company may have in the bed of the Guyandotte River.

It follows from the foregoing that the decree of the circuit court in refusing the injunction prayed for should be reversed, and this suit remanded to the Circuit Court of Lincoln County for the purpose, and for the purpose only, of issuing an injunction in the manner and form as prayed for in the plaintiffs' bill of complaint.

*Reversed and remanded with directions.*